Jerry D. WALKER, Trustee of the Lou Miller Trust, Miller Family B–1 Trust, and Miller Family B–2 Trust, Appellant

v.

COTTER PROPERTIES, INC., L.L. Cotter, Mary Ka Cotter, Brandon Cotter, And Amy Cotter, Appellees.

No. 05–04–01298–CV.

Court of Appeals of Texas, Dallas.

Jan. 9, 2006.

---

Bill C. Hunter, Dallas, for Appellant.

Ben L. Krage, Krage & Janvey, L.L.P., Dallas, for Appellee.

Before Justices FITZGERALD, LANG–MIERS, and MAZZANT.

## OPINION

Opinion by Justice MAZZANT.

Jerry D. Walker, trustee of the Lou Miller Trust, Miller Family B–1 Trust, and Miller Family B–2 Trust (Walker), appeals the trial court's take-nothing judgment in favor of L.L. Cotter, Mary Ka Cotter, Brandon Cotter, Amy Cotter, and the Cotter Properties (the Cotters). We affirm the trial court's judgment.

### FACTUAL BACKGROUND

Capital Equipment Leasing Company (CELC) was a Texas general partnership comprised of partners Charles L. "Skip" Shaw, his brother, Bart Shaw, and Vernon Walker (no relation to Jerry Walker). CELC was in the equipment leasing business. Beginning in 1994, Jerry Walker, in his role as trustee of the Miller Family B–1 and B–2 trusts, started loaning money to CELC for what he thought were legitimate investments in equipment leases. Between 1994 and 2000, Walker loaned trust money to CELC, through Skip Shaw, more than seventy-five times. He received a fee from CELC of approximately $1,000 for each transaction.

Amy Cotter is Skip Shaw's daughter. In 1997, Skip Shaw approached Brandon Cotter, Amy's husband, with an invest-ment opportunity regarding equipment leases. Brandon and Amy Cotter banked at Wells Fargo. Skip Shaw banked there also, through an account in the name of Corporate Holdings, Inc. On the eleven occasions when Brandon Cotter invested money with his father-in-law, the investments were made by transferring funds from Brandon's account to the Corporate Holdings account at Wells Fargo Bank. A few months after making an investment, Brandon would receive a check from CELC, signed by Vernon Walker. The checks from CELC were always for an amount of money in excess of what was transferred to the Corporate Holdings account. Brandon thought these were returns on legitimate business investments with his father-in-law. Amy Cotter was aware that she and her husband were making investments with her father, but she was not involved in the transactions. The terms of the transactions were not put into writing.

Skip Shaw also approached Brandon's father, L.L. Cotter, about making similar business investments. Through checks payable to CELC, L.L. Cotter, together with his wife, Mary Cotter, and their company, Cotter Properties, Inc., made eight investments in CELC between March 5, 1997 and November 12, 1999. Apart from a $35,000 personal loan to Skip Shaw,[1] all of the transactions involving Shaw called for the payment of a percentage of an expected profit.[2] Shortly after each transfer of money, L.L. Cotter, like his son and daughter-in-law, received a check from

---

1. L.L. Cotter was repaid $13,800 of the $35,000 he loaned to Shaw.

2. According to a March 5, 1997 memorandum agreement between Shaw and L.L. Cotter (written on CELC stationary and signed by Shaw as partner), in return for a $24,000 loan to CELC, L.L. Cotter would receive two thirds of the net profit from the sale of ten hydraulic lifts. The terms of the other transactions were not put into writing, but on four of the seven subsequent occasions when L.L. Cotter wrote checks to CELC, Shaw executed a promissory note on behalf of CELC.

CELC, signed by Vernon Walker, for a sum above what had been invested. He believed he was profiting from legitimate investments.

On July 7, 1999, Brandon Cotter transferred $23,000 to the Corporate Holdings account. On November 12, 1999, his father wrote a check to CELC for $34,000. They were never repaid. In fact, very little of the money invested by either the Cotters or Jerry Walker was used to purchase or lease equipment, and most of the lease transactions were fraudulent. Walker became aware of the fraudulent leases in September of 2000 when Shaw confessed to him that he had been cheating him. The Cotters learned of the fraudulent investments sometime in the beginning of the following year.

Walker eventually reached a settlement and restitution agreement with CELC and its partners,[3] under which Walker obtained a collateral assignment of any claims CELC might have against third parties. He then filed suit against the Cotters based on a theories of quasi-contract, unjust enrichment, and conversion, claiming the money they received from CELC constituted loans or advances, not returns on investments, and they were expected to repay this money. His petition alleges:

> On sundry dates, Charles L. Shaw, III ("Shaw") advanced and delivered funds to Cotter Properties ($42,554.86), [L.L. Cotter] ($108,640), [Brandon Cotter] ($55,015) and [Amy Cotter] ($10,400), such advances aggregating $210,609.86. The funds advanced to the above parties were taken from accounts and funds of CELC by Shaw, which was known or should have been known to each of the above parties.

The Cotters moved for summary judgment. The trial court granted a partial summary judgment in their favor, holding that Walker's claims for advances or payments made more than four years before the date suit was filed—April 17, 2002— were barred under the four-year limitations period in section 16.003 of the Texas Civil Practice and Remedies Code.

The remainder of the case was tried before the court. At the conclusion of Walker's case-in-chief, the Cotters moved for a directed verdict. The trial court granted the motion and a take-nothing judgment was entered against Walker. The trial court also entered findings of fact and conclusions of law. The following findings are relevant to our disposition of this case:

> 7. Beginning in 1997, Brandon and Amy Cotter loaned money to CELC (through C. Shaw) for what they believed were legitimate investments to buy and lease equipment. In truth, each of the loans that Brandon and Amy Cotter made were fraudulent, in that no equipment was purchased and no lease existed. They were at all times unaware of the truth, until after the making of their last "loan" to CELC (through Shaw) in the amount of $23,000, which was never repaid.
>
> 8. Likewise, beginning in 1997 and continuing into 1999, L.L. Cotter, Mary Ka Cotter and Cotter Properties, Inc. made loans to CELC (through C. Shaw) which they believed were legitimate investments to buy and lease equipment. In

---

3. The other partners in CELC, Bart Shaw and Vernon Walker, maintained they knew nothing about Skip Shaw's fraud. Vernon Walker was the only signatory on the partnership's bank account. He testified that Skip Shaw prepared and maintained all of the partnership's records and presented checks to him for his signature. Walker also testified that after the discovery of Skip Shaw's fraud, an investigation revealed that his signature had been forged on several checks.

truth, each of the loans that L.L. Cotter, May Ka Cotter and Cotter Properties, Inc. made to CELC were fraudulent, in that no equipment was purchased and no leases existed. They were at all times unaware of the truth, until after the making of their last "loan" to CELC (through C. Shaw) in the amount of $34,000, which was never repaid.

9. Subsequent to each occasion (except the last one) when Brandon and Amy Cotter made "investments" with CELC, they would receive payment from CELC which they believed to be return on their principal plus a profit portion. In total, however, Brandon and Amy Cotter lost money on these "investments" with CELC.

10. Subsequent to these events, Walker discovered C. Shaw's fraudulent operation. A settlement agreement was made between CELC, its partners and Walker; that agreement includes an assignment from CELC to Walker of any claims that CELC might own against anyone. Walker has sued the defendants in this case as the assignee of CELC.

11. The payments that CELC made to [the Cotters] were not intended by anyone to be advances or loans and they were not advances or loans.

. . . .

15. [The Cotters] were not unjustly enriched at the expense of CELC.

■ Walker raises three issues in his appeal. First, he argues that Amy and Brandon Cotter should be held liable based on implied or quasi-contract principles. Second, he claims implied or quasi-contract, restitution, and unjust enrichment likewise render Cotter Properties,

L.L. Cotter, and Mary Ka Cotter liable. Walker's third issue attacks the trial court's ruling granting partial summary judgment in favor of the Cotters on the defense of limitations for payments made before April 17, 1998. He argues that application of the discovery rule and fraudulent concealment tolled the statute of limitations.[4]

### DISCUSSION

■ In an appeal from a bench trial, findings of fact carry the same weight as a jury verdict. *Aldine Indep. Sch. Dist. v. Ogg,* 122 S.W.3d 257, 265 (Tex.App.-Houston [1st Dist.] 2003, no pet.). Factual and legal sufficiency challenges to the trial court's findings are reviewable under the same standards that are applied in reviewing evidence supporting a jury's verdict. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994). Walker's first two issues attack both the legal and factual sufficiency of the evidence supporting the trial court's finding that the payments CELC made to the Cotters were not advances or loans, nor were they intended to be advances or loans.

■ Anything more than a scintilla of evidence is legally sufficient to support a challenged finding. *Formosa Plastics Corp. v. Presidio Engineers & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.,* 77 S.W.3d 253, 262 (Tex.2002). We will sustain Walker's factual sufficiency challenge only if we find the supporting evidence is so weak or the finding so contrary to the overwhelming weight of the

---

**4.** We will not address Walker's conversion claim because Walker does not raise the issue in his brief. *See* Tex.R.App. P. 38.1(h) (provid-ing that brief must contain clear and concise argument for contentions, with appropriate citations to authorities and record).

evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965).

As noted previously, Walker's principal theory of recovery is based on quasi-contract and unjust enrichment. A contract implied in law, or a quasi-contract, is distinguishable from a true contract because a quasi-contract is a legal fiction, an obligation imposed by law regardless of any actual agreement between the parties. *Fraud–Tech, Inc. v. Choicepoint, Inc.,* 102 S.W.3d 366, 368 (Tex.App.-Fort Worth 2003, pet. ref'd). This equitable doctrine allows for the recovery of damages to prevent a party from obtaining a benefit from another by fraud, duress, unjust enrichment, or because of an undue advantage. *See Fortune Prod. Co. v. Conoco, Inc.,* 52 S.W.3d 671, 684 (Tex.2000); *see also Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex. 1992). Unjust enrichment is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay. *Oxford Fin. Co., Inc. v. Velez,* 807 S.W.2d 460, 465 (Tex.App.-Austin 1991, writ denied); *City of Corpus Christi v. Heldenfels Bros.,* 802 S.W.2d 35, 40 (Tex.App.-Corpus Christi 1990), *aff'd,* 832 S.W.2d 39 (1992). The unjust enrichment doctrine applies principles of restitution to disputes where there is no actual contract and is based on the equitable principle that one who receives benefits which would be unjust for him to retain ought to make restitution. *Burlington N. R.R. Co. v. Southwestern Elec. Power Co.,* 925 S.W.2d 92, 101 n. 5 (Tex. App.-Texarkana 1996, no writ), *aff'd,* 966 S.W.2d 467 (Tex.1998); *Bransom v. Standard Hardware, Inc.,* 874 S.W.2d 919, 927 (Tex.App.-Fort Worth 1994, writ denied).

Viewing the trial court's finding in the appropriate light, we conclude there is ample evidence in this record to support it. The evidence shows that the Cotters, like Walker, lost thousands of dollars through fraudulent business dealings with Skip Shaw. There is no evidence any of the payments the Cotters received from CELC were advances, loans, or mistaken payments, nor is there evidence of any mutual intention between CELC and the Cotters for them to pay that money back. Brandon and L.L. Cotter believed they were making legitimate business investments with Skip Shaw. They thought the checks they were receiving from CELC represented returns on those investments, and the payments were never intended to be loans or advances. Shaw, the perpetrator of the scheme, testified that none of the payments to Brandon and Amy Cotter were intended to be loans or advances. According to his testimony, the checks exceeded the original investments because he wanted to induce the Cotters to invest more money. In Shaw's words: "It was to facilitate the fraud. In other words, why would you invest in something you didn't get a profit on so it was to induce them to give me the money at the beginning." He testified that the investments his son-in-law and daughter made with him were intended to be investments in CELC. He also explained that the vast majority of the funds transferred to the Corporate Holdings account—which was not used in any of the transactions involving L.L. Cotter, Mary Ka Cotter or Cotter Properties, Inc.—went into CELC, where some of it was used to repay loans from Walker.

We conclude there is evidence in the record to support the trial court's finding. Walker's legal sufficiency challenge therefore fails. Furthermore, because we con-

clude the supporting evidence is not too weak nor is the finding so against the great preponderance of the evidence as to be clearly wrong and manifestly unjust, Walker's factual sufficiency challenge also fails.

Walker's first and second issues are overruled. Given our disposition of Walker's first and second issues, we need not consider his third issue, whether application of the discovery rule and fraudulent concealment tolled the statute of limitations.

The judgment of the trial court is affirmed.