**Affirm and Opinion Filed June 29, 2022**



In The
# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-20-01032-CV

### IN THE INTEREST OF T.R., L.R., J.R., S.R., E.R., C.R. AND V.R., CHILDREN

**On Appeal from the 255th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-18-06935**

## MEMORANDUM OPINION

Before Justices Myers, Osborne, and Nowell
Opinion by Justice Myers

The children's Mother appeals from the trial court's judgment imposing sanctions against her under section 156.005 of the Family Code ordering her to pay Father's attorney's fees of $5,000. *See* TEX. FAM. CODE ANN. § 156.005. Mother brings one issue on appeal contending the trial court abused its discretion because the evidence did not support imposition of the sanction. We affirm the trial court's judgment.

# BACKGROUND

Mother and Father were married and had seven children, six boys and one girl. Four were their biological children and three were adopted, E., J., and L. The children were between three and ten years of age when suit in this case was filed.

On January 18, 2019, the trial court signed the agreed divorce decree. The decree named the parties joint managing conservators of the children with Mother having the exclusive right to designate the children's primary residence. The decree required Father to pay Mother spousal support of $3,000 per month through January 1, 2022, and child support of $3,420 per month. The decree also stated,

> It has been represented to the Court that there have been incidents which could constitute family violence within the past two years that has involved the children; however, the parties have put in safe-guards within the Decree for the protection of the children and to prevent family violence from occurring in the future. The parties believe that all access to the children set out herein would not endanger the children's physical health or emotional welfare and would be in the best interest of the children.

The safeguards in the decree included Father having limited supervised visitation with the children that over time was increased to the standard possession schedule without supervision and finally to the expanded standard possession schedule without supervision. The decree also required Father to attend counseling from October 1, 2018 to March 31, 2019. Father began seeing a counselor in April 2018.

On September 24, 2019, eight months after the divorce decree, Mother filed a petition to modify the parent-child relationship. Mother stated that Father had "a history or pattern of committing family violence during the two-year period

–2–

preceding the date of filing of this suit," and Mother alleged Father "is likely to commit family violence in the future." Mother requested that Father be denied access to the children or that his access be supervised and that he be required to undergo a "battering intervention and prevention program."

On October 29, 2019, Father filed a motion for sanctions under section 156.005 of the Family Code.

On November 1, 2019, the associate judge held a hearing to determine whether to impose temporary orders during the pendency of Mother's petition to modify. At the end of the hearing, the associate judge stated, "what's going on with the children is obviously concerning" but observed that the court "really doesn't have sufficient evidence to determine exactly what is going on." The associate judge ordered the parties to interview with Family Court Services, appointed an amicus attorney, and ordered that a child-custody evaluation be performed. It does not appear from the record that a child-custody evaluation was performed.

On June 16, 2020, the associate judge denied Mother's motion for a child-custody evaluation and ordered the parties to set the petition for modification for trial. Mother nonsuited her petition the same day.

On June 24, 2020, the district judge held a hearing on Father's motion for sanctions. Besides testimony, the district judge also admitted into evidence the reporter's record of the November 1, 2019 hearing before the associate judge. Father's attorney presented evidence that his firm's reasonable and necessary fees

for representing Father in the modification proceeding were more than $114,000. At the conclusion of the hearing, the district judge determined that Mother's filing of the petition for modification "was frivolous and designed to harass the father." The court ordered Mother to pay Father's law firm $5,000. The district judge signed a written order on the motion for sanctions on August 27, 2020.

Both Mother and Father filed requests for findings of fact and conclusions of law with proposed findings of fact and conclusions of law. On October 15, 2020, the trial court signed the proposed findings of fact and conclusions of law filed by Mother. On October 29, 2020, the trial court signed Father's proposed findings of fact and conclusions of law as "The Court's Adopted Findings of Fact."

## FAMILY CODE SECTION 156.005

The Family Code permits a party to petition for modification of an order that provides for the appointment of a conservator, the terms and conditions of conservatorship, or for the possession of or access to a child if (a) the modification would be in the best interest of the child; and (b) "the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since . . . the date of the rendition of the order." FAM. § 156.101(a).

Section 156.005 of the Family Code provides: "[I]f the court finds that a suit for modification is filed frivolously or is designed to harass a party, the court shall

–4–

state that finding in the order and assess attorney's fees as costs against the offending party." FAM. § 156.005.[1]

## STANDARD OF REVIEW

We review the trial court's award of attorney's fees under section 156.005 for an abuse of discretion. *Kelsall v. Haisten*, 564 S.W.3d 157, 164 (Tex. App.—Houston [1st Dist.] 2018, no pet.). When the trial court makes findings of fact and conclusions of law concerning the issue, we review the sufficiency of the evidence of the findings. "If the evidence is sufficient to support the trial court's findings and conclusions, the trial court did not abuse its discretion." *Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 836 (Tex. App.—Dallas 2008, pet. denied).

We review challenges to the sufficiency of the evidence to support findings of fact under the same standards for reviewing evidence to support a jury's verdict. *Walker v. Cotter Props., Inc.*, 181 S.W.3d 895, 899 (Tex. App.—Dallas 2006, no

---

[1] In a suit for modification, the trial court has discretion to award attorney's fees under section 106.002 or section 156.005. *See* FAM. §§ 106.002, 156.005. Under section 156.005, the attorney's fees are "assess[ed] as costs." *Id.* § 156.005. Under section 106.002, fees are not awarded as costs. Instead, "the court may render *judgment* for reasonable attorney's fees and expenses and order the judgment and postjudgment interest to be paid directly to an attorney." *Id.* § 106.002(a) (emphasis added). A judgment for fees and expenses under section 106.002 "may be enforced in the attorney's name by any means available for the enforcement of a judgment for debt." *Id.* § 106.002(b). In this case, the trial court made findings of fact consistent with section 156.005 by finding the petition to modify "was filed frivolously and designed to harass Respondent." But the court did not "assess attorney's fees as costs" against Mother as required by section 156.005. Instead, the court ordered Mother to pay "the fees, costs and interest" to Father's attorney and authorized Father's attorney to enforce "this judgment . . . in the attorney's own name by any means available for the enforcement of a judgment for debt." The order is a hybridization of the two statutes because it cites section 156.005 and makes findings under that section, but the order awards the fees in the manner authorized by section 106.002. The trial court may have erred by awarding a judgment to Father's attorney for the fees instead of assessing them as costs. However, neither party objected in the trial court or complains on appeal of the trial court's failure to follow section 156.005's requirement that the fees be assessed as costs. Therefore, any error by the trial court in the manner of awarding fees is not preserved for appellate review and is waived on appeal. TEX. R. APP. P. 33.1(a)(1).

pet.). In evaluating the legal sufficiency of the evidence to support a finding, we must determine whether the evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Columbia Med. Ctr. Subsidiary, L.P. v. Meier*, 198 S.W.3d 408, 414 (Tex. App.—Dallas 2006, pet. denied) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). Anything more than a scintilla of evidence is legally sufficient to support a challenged finding. *Walker*, 181 S.W.3d at 899. When we review a finding for factual sufficiency, we consider all the evidence and will set aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). Unchallenged findings of fact are conclusive on appeal unless the contrary is established as a matter or law or there is no evidence to support the findings. *Toles v. Toles*, 45 S.W.3d 252, 265 n.6 (Tex. App.—Dallas 2001, pet. denied) (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986)). We review a trial court's legal conclusions de novo. *See Walker v. Anderson*, 232 S.W.3d 899, 908 (Tex. App.—Dallas 2007, no pet.). We evaluate those conclusions independently to determine whether the trial court correctly drew each conclusion from the facts. *Id.*

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this case, the record contains conflicting sets of findings of fact and conclusions of law. On October 15, 2020, the trial court signed the findings of fact

–6–

and conclusions of law prepared by Mother. The findings of fact included, "The CPS file contained statements from caseworkers and supervisors that there was concern of ongoing physical and emotional abuse by the father and paternal grandmother against some of the children." The conclusions of law included the following:

> 8. Counsel for [Father] did not offer any evidence that [Mother's] pleadings were not filed in good faith.
>
> 9. Therefore, [Father] did not produce any evidence sufficient to overcome the presumption that pleadings were filed in good faith.
>
> . . . .
>
> 14. Therefore [Mother] produced sufficient evidence to show there had been a material and substantial change in circumstances by showing that there were post-Decree allegations of physical abuse, emotional abuse, and new disclosures of past physical abuse.

These findings and conclusions favor Mother.

Two weeks after signing Mother's findings of fact and conclusions of law, on October 29, 2020, the trial court signed "The Court's Adopted Findings of Fact" prepared by Father. The findings and conclusions in this document conflicted with the court's earlier signed findings and conclusions. The findings included, "Mother's assertion that CPS found ongoing physical and emotional abuse by Father is completely false." The conclusions of law included:

> 1. At the time [Mother] filed her Petition to Modify, there was no evidence to support an allegation that the circumstances of either the child or a person affected by the order had materially and substantially changed since the Agreed Decree was rendered.
>
> . . . .

7. The allegations brought by [Mother] were intended to deceive and mislead the court.

. . . .

13. The allegations in the Petition to Modify were based on events that happened before the date of divorce. Therefore, such events and allegations were no evidence to support an allegation that the circumstances of either the child or a person affected by the order had materially and substantially changed since the order was rendered.

14. Based on the testimony and evidence the Court finds that the Petition to Modify Parent-Child relationship filed by [Mother] was filed frivolously and designed to harass [Father], and sanctions should be assessed pursuant to Texas Family Code Section 156.005.

These findings and conclusions favor Father.

When a trial court files a set findings of fact and conclusions of law that covers the whole case and later files a second set of findings of fact and conclusions of law that also covers the whole case and that are inconsistent with the first set of findings and conclusions, we presume that the trial court intended for the second set of findings and conclusions to substitute for the first set and intended for the second set to control the disposition of the case. *Waters v. Yockey*, 192 S.W.2d 769, 769–70 (Tex. 1946); *see also In re A.B.R.*, No. 04-17-00220-CV, 2018 WL 3998684, at *9 (Tex. App.—San Antonio Aug. 22, 2018, no pet.) (mem. op.) (second amended findings of fact and conclusions of law replaced prior findings of fact and conclusions of law, citing *Waters*). In this case, the trial court signed and filed the findings and conclusions submitted by Mother and then signed and filed the findings and conclusions submitted by Father. Therefore, we presume the trial court intended

for the findings and conclusions submitted by Father to substitute for the earlier-filed findings and conclusions submitted by Mother, and we do not consider the findings and conclusions submitted by Mother.

**WHETHER THE PETITION FOR MODIFICATION WAS FRIVOLOUS**

"A 'frivolous' suit is generally understood to mean one that does not have a reasonable basis in law or fact." *Thielemann v. Blinn Bd. of Trustees*, No. 01-14-00595-CV, 2015 WL 1247018, at *2 (Tex. App.—Houston [1st Dist.] Mar. 17, 2015, no pet.) (mem. op.) (citing *Gen. Elec. Credit Corp. v. Midland Cent. Appraisal Dist.*, 826 S.W.2d 124, 125 (Tex. 1991)); *see generally* TEX. R. CIV. P. 13 (authorizing sanctions against party or party's attorney for filing "groundless" pleading, defining "groundless" pleading as having "no basis in law or fact"). In determining whether sanctions are appropriate, the trial court must examine the facts available to the litigant and the circumstances existing when the litigant filed the pleading. *Kelsall v. Haisten*, 564 S.W.3d 157, 165 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

Father asserted in his motion for sanctions that there had not been a material and substantial change in circumstances since the divorce decree. Mother argues she introduced evidence showing she acted in good faith in petitioning for modification because the evidence showed the circumstances changed substantially and materially after the trial court signed the divorce decree. In support of her assertion, Mother relied on the reports of CPS employees and on the reporter's record from the November 1, 2019 hearing before the associate judge, both of which

were admitted into evidence at the hearing before the district judge on Father's motion for sanctions.

The question before the district judge was whether Father proved that when Mother signed the petition to modify on September 24, 2019, Mother lacked a good-faith belief that conditions for the children had substantially and materially changed after the trial court signed the divorce decree on January 18, 2019. The question before this Court is whether the district judge abused its discretion by finding Mother's petition was frivolous or designed to harass Father.

The evidence showed that before the divorce decree, Father had physically disciplined the children. Father would spank the children with a belt. In one incident, a metal belt buckle struck the child E. in the head cutting her. On another occasion, while Father was bathing E., he held her head underwater and then pulled her back up. Father may also have bruised some of the children when disciplining them. These incidents occurred before the divorce decree was signed, and the decree enjoined the parties from using corporal punishment on the children.

Mother's petition for modification sought to have Father denied all access to all the children or have his access be supervised. Mother relied on documents in a CPS investigation begun in February 2019 (the month after the divorce decree) following a referral from the children's counselor. Mother also relied on witnesses'

testimony at the November 1, 2019 hearing before the associate judge.[2] Mother argues she presented evidence at that hearing of a material and substantial change to children's circumstances.

**The November 1, 2019 Hearing**

The children's counselor, Charissa Fry, began treating E., age 8 years old, on February 13, 2019, after E. misbehaved in school including throwing chairs. E. was homeless before being adopted by Mother and Father. Fry diagnosed E. as suffering from PTSD because E. had experienced incidents in which she was in danger of imminent bodily harm or death. Fry testified she believed E. was currently being emotionally abused by Father based on E.'s "reenactment of the abuse in the play therapy room, the unwillingness to discuss abuse at all, past or present." Fry did not explain what abuse E. reenacted during play therapy other than "maltreatment." Nor did Fry identify the perpetrator or date of the abuse E. reenacted. When Fry asked E. about ongoing abuse, E. would either ignore the question or say "everything's fine." E. told Fry that Father would ask E. about her therapy sessions and ask her what they had discussed.

Fry testified that J., also 8 years old, was subjected to trauma and abuse. Like E., J. was adopted by Mother and Father. J. would wet the bed a few nights a week. Fry testified bedwetting beyond a certain age "usually involves trauma." Fry stated

---

[2] The transcription of the hearing does not contain the exhibits, which included the parties' written communications and photographs. We have only the witnesses' descriptions of these documents.

–11–

she believed J. had been traumatized and that he is continuing to suffer emotional abuse from Father.

Fry testified that none of the four children she counseled would talk about their experiences at Father's house other than to say everything was fine. This behavior led Fry to conclude that Father was emotionally abusing the children. Fry testified, "Because in the course of domestic violence, children who are continually exposed to an abuser who creates nurture and then abuse, they align with the abuser to keep themselves safe in a situation they feel trapped in; and they keep the secret and they show compliance."

Fry also testified that during the summer of 2019, Father had forty days of unsupervised visitation with the children, and the children did not report that anything happened while staying with Father. Mother told Fry in August that some of the boys had difficulty with the transitions at first. But, as Mother told Fry, "[a]s the summer has gone, I felt that almost everyone has responded better each time." Mother told Fry, "overall the summer schedule went just fine."

Besides providing counseling for the children, Fry also provided parent coaching to Mother to help her care for seven young children. Fry stated she exchanged many e-mails with Mother about the children.

Melanie Brooks, an investigator for CPS testified she investigated the report from Fry about E.'s head being held underwater. This incident occurred before the divorce. She testified E. disclosed there was another incident where E. was at

–12–

Father's house and Father told her to sleep face down in her pillow and Father pushed E's head into the pillow. Brooks did not know whether E. was able to breathe when Father pushed her head into the pillow. This incident occurred shortly after the divorce decree was signed. However, Brooks also testified that "any of the allegations that's happened since the date of divorce, those have all been ruled out."

Concerning emotional abuse, Brooks said E. told her that Father said Mother does not love her. Brooks asked E. what she thought, and E. said she thought both Mother and Father loved her. The record does not show when Father told E. Mother did not love her. Brooks also had concerns about the children based on the children's refusal to tell her anything currently happening, Father's failure to answer her questions directly, and because Father lied to her.

Kenisha Wilson, who works for CPS, testified the case was transferred to CPS's Family-Based Safety Services due to physical abuse by Father, namely, E's being hit in the head by the belt and "the allegations of her head being pushed down." Wilson said both of these incidents occurred before the divorce. Wilson testified there were no allegations of physical abuse occurring after the divorce.

Wilson believed Father was emotionally abusing the children. E. started to tell Wilson about having popcorn at the movie theater but stopped and told Wilson she could not say anything further. When Wilson pressed E. to tell her, E. said, "Uh-uh, we're not supposed to talk about our feelings." Wilson asked E. if she felt safe in Father's home, and she said, "Sometimes." When Wilson asked her why she did

not feel safe, she said, "Well, Dad gets crazy sometimes. . . . [I]f I tell you, then I'm going to get in trouble with Dad. . . . He told us we're not supposed to tell anyone anything that goes on or we'll get in trouble." Wilson did not testify whether Father's instructions to E. not to talk about her feelings or about what happens at his house was before or after the signing of the divorce decree. Wilson testified the children's answers to her appeared to be coached because they gave her "the exact same answers" to her questions.

Mother testified at the hearing that circumstances had changed because the children's behavior had deteriorated following the signing of the divorce decree.

> I observed two major shifts in the children's behavior. Beginning in about February of 2019, I started seeing the kids seeming much more anxious, seeming withdrawn, seeming fearful about going to counseling or about interacting with the CPS workers. They seemed very preoccupied about the state of our family, about the calendar, about future events. So that was the first shift that I observed. And then beginning around August of this year, I noticed a major change in particular with three of my older boys, [T.], [S.], and [J.]. They became increasingly aggressive toward each other and toward me. They became much more argumentative and combative. They were very mistrusting. They would not let me hug and kiss them before bed anymore. When they returned home from visits, they wouldn't make eye contact with me. And so I became very concerned.

Mother testified this shift in the children's behavior began in February 2019, after the children had visitation with Father.

Mother also testified about a bruise and scratch L. had on his chest. Mother said L. told her he got the bruise and scratch when Father told him to go into "time out"; L. forgot, and Father roughly picked up L. under his arms and carried him to

time out. Mother testified L. told her he got the bruise and scratch when Father picked him up.

Mother also testified that Father sent her an e-mail about one of the boys stating, "I had to threaten a lot of things to get him to agree to be really good at your house." Father testified that the rest of the e-mail showed that what he threatened was that he would not coach the child anymore if the child was not well-behaved at Mother's house.

Mother testified that the three adopted children, E., J., and L, were more fearful and withdrawn before visitation with Father. She said, "They have a very different personality leading up to visits with him." Mother also testified about the problems J. had after the divorce. She described how he was becoming more aggressive and destructive of property and how she would have to restrain him. She spoke to Father about J., and he told her he does not have any problems with the children and that he cannot control the way they are at her house.

Mother also testified that Father was "very involved" with the children, coached some of their sports teams, and attended their practices. Mother said the children trust Father. She also said she has occasionally since the divorce asked Father to come to her house to help with the children and he has done so.

Father's counselor, Dr. Jeffrey Siegel, testified that Father "has . . . a positive engaged relationship with [the children] and obviously enjoys being with them." Dr.

Siegel said he did not consider Father to be a danger to the children. Dr. Siegel also testified about the progress Father had made in counseling:

> [Father] was aware that [he was] . . . a very boundaried individual. He was aware that he was a very structured, religious individual and was coming to understand that there are -- there are times that maybe that level of rigidity, that level of what we would call black-and-white thinking or right/wrong thinking needs to have some flexibility.
>
> I think he was much more willing to consider those things and, I think, began to look at his own behavior more critically . . . developed what we would call kind of the observing self, or the observing ego, where he's really kind of standing there and looking at what he's doing and asking himself why.

The former nanny Father used for the children after the divorce was asked how she would describe Father as a father: "Exceptional. Exceptionally amazing. He was, I mean, very caring. He spent tons of time with the kids. Just loving." She explained Father disciplined the children by putting them in "time out" or by threatening to take away their "screen time." Father also encouraged non-screen activities such as going to the park or conversing together. She testified Father was not physically aggressive with the children and the children were not aggressive with him or each other. The nanny never heard Father tell the children anything disrespectful about Mother or anything that would cause them to be disrespectful towards her.

The nanny also testified about the popcorn incident E. refused to tell Wilson about. The nanny said she was at the movie theatre with the children and bought them some popcorn. E. got a popcorn kernel stuck in her throat and started gagging.

–16–

The nanny patted her on the back. As they walked out of the movie theater, E. told the nanny she thought she was going to throw up. The nanny texted Father about the incident, and he drove immediately to the theater with a change of clothes for E. and took the children home. The nanny testified she knew of no reason why Father's possession of the children should be supervised. She said that even though she no longer worked for Father, she wanted to testify because she felt strongly about Father being a good, fit parent.

Father's girlfriend for the six months before the hearing testified she is an attorney and dance teacher. As a dance teacher, she sees the parents of many children. She said she had not seen Father be aggressive with the children or them be aggressive with each other or with him. She said, "He's kind, he's nurturing, he's protective. He's very affectionate with them to a degree that I don't think most dads are. He's playful, he's energetic." She said, "He is probably one of the best dads that I have ever encountered." She has not seen Father "engage in any kind of threat to the children, verbally abuse them, or try to control them." She said Father encourages the children to be respectful to Mother and to do what Mother says. She said she did not see Father try to control what the children said.

Father testified that there were things he did before the divorce that he was sorry for and apologized for. He said he knew J.'s behavior was worse, but that the other children "have improved dramatically."

At the end of the hearing, the associate judge said,

After hearing the evidence and reviewing all the documentary evidence, obviously what's going on with the children is concerning. At this time, the Court really doesn't have sufficient evidence to determine what exactly is going on. There's a lot of different things in play here, and it could be a combination of a number of different things.

But the Court is concerned about it, and I'm going to order several different things to be put into motion to get the Court more information.

The associate judge ordered Mother to arrange for Family Court Services to interview the children and for the report to be ready at the time of the next hearing in December.[3] The associate judge also appointed an amicus attorney for the children and ordered a child-custody evaluation be performed. The record shows no child-custody evaluation was performed, and the associate judge later denied Mother's request for a child-custody evaluation.

**The CPS Reports**

Mother also cites as evidence the reports of CPS employees from February 15 through July 1, 2019. CPS's investigation began after Fry reported E.'s outcry that Father had held her underwater while bathing her. After reporting on what E. and the parents had told the investigators, Brooks's report for February 15, 2019, states, "[E.] did not make an outcry of recent abuse or neglect. The allegations reported all occurred in Houston and years ago. Since then the father . . . has received court appointed counseling and has partially supervised visitation with the children." On February 21, 2019, the report stated, "Safety Assessment Discussion: The children

---

[3] The report is not part of the record before this Court.

are safe at this time." There was no entry in the report under the heading "Current Danger Indicators."

Brooks's report on February 21, 2019, states she interviewed L. L. told her "what he doesn't like about [Father's house] is that he doesn't let him do [iPad] that much, only like 2 minutes." Brooks said L.'s "behaviors and actions were typical of children of the same age group." Brooks said she did not see any signs of abuse or neglect on L.

Brooks's report on February 21 also states she interviewed J. Concerning life at Father's house,

> [h]e stated dad's house is fun because he lets him and [S.] make lunch, he has basketball goals, he lets them stay up to 9 or 10 p.m. and wake up late. . . . He stated there is not anything bad that happens at dad's house. He stated no one is hit or spanked at dad's house. . . . He stated he is not scared of anyone or anything in his mom or dad's home.

Brooks stated, "[J.'s] behaviors and actions were typical of children of the same age group," and Brooks did not see any signs of abuse or neglect on J.

On April 12, 2019, Brooks interviewed the children, including E. Brooks reported:

> [E.] pulled me into her room and showed me her toys and then I thanked her and told her I was going to go. Then she said she wanted to show me her brothers['] toys. It seemed she didn't want me to leave so I asked her was everything ok. While in her brother's room she told me her dad always asks her what CPS, Charisa [Fry] and mommy say and if she says the wrong thing he gets mad. She also said her dad tells her that her mom doesn't love her. She said she thinks both her mom and her dad love her. I asked her does she like living with mommy and daddy or just mommy or just daddy. She stated she likes living with her mommy but its ok with her if she see's her dad sometimes. I

–19–

thanked her for letting me know how she feels. She asked me why does her dad always say mommy doesn't love her. I asked her what does she believe is true. She stated she thinks her mommy loves her. I told her well if someone tells you any different don't argue with them but just remember what you already know in your heart is true, which is what? And she stated, that my mommy loves me. I told her that's right and don't forget it. I asked her was there anything else she wanted me to know. She stated no.

As Brooks was leaving, she spoke to Mother:

I explained to her that [E.] expressed her dad was telling her that mommy doesn't love her. She stated she's not surprised. She stated she knows that the children will eventually see him for who and what he is and so will the world. She stated no one believed her at first. She stated he doesn't like that he can't control [E.] like he can control the rest of them. She stated this just sucks because there's not anything she can do about it. She stated he is textbook emotionally abusing those children.

On May 20, 2019, Brooks interviewed the children about the bruise and

scratch on L's chest.

He [L.] stated he was coming down the stairs and he was almost at the end and his dad grabbed him. He stated when his dad grabbed him he scratched him on accident on his chest. He stated his dad told him not to go upstairs because his brother was sleeping and he got a warning. He stated nothing else happened. He stated he got in a little trouble but he just got a warning. He stated he does not think anyone would hurt him. He stated he likes both mom and dad's home.

The other children (except for E. who was not home at that time) told Brooks either

they did not know L. was scratched or they did not know how he got scratched.

Father told Brooks L. got the scratch when he was running on the treadmill, looked

away, and fell down on his chest. Father said he could not have scratched L. by

–20–

picking him up because he does not have any fingernails and he did not pick him up hard enough to make a scratch.

On May 30, 2019, Brooks reported,

The 3 children adopted appear to be singled out by father and there are serious concerns about PHAB [physical abuse] that is aimed at these children. There are also serious concerns about father being controlling and that when the parents were together there is concern that the children witnessed this. Children need therapy and parents are not able to get kids in therapy.

On June 19, 2019, Brooks reported, "Safety Assessment Discussion: The children are safe." That report also states: "PHAB—Reason to Believe." The report then describes E.'s outcries of being hit with the belt by Father, his holding her underwater, his spanking her and his "[tying] her to something in mom's room," all of which happened before the divorce.

On August 6, 2019, Kenisha Wilson reported,

[Mother] and the children were attending counseling before the case came in. . . . The counselor states the mother and children have made progress and she does not have any concerns at this time. [Mother] is protective of the children and the father attends counseling as well to address his anger management. There ha[ve] not been any outcries of abuse since the case came into care.

On August 13, 2019, Wilson spoke to Mother:

I informed [Mother] that the agency was looking to close her case if the counselors did not have any concerns and after I spoke with everyone in the home. [Mother] stated ok. I asked if she had any concerns and she stated the only concern she has is [Father]. She stated [Father] is no longer physically abusing the children at this moment but he is still emotionally abusing them. [Mother] informed me when the children went to a visit last month with their father they went to the movies. She stated [E.] told her she choked on a piece of popcorn and threw up in

–21–

the theatre. [Mother] stated [E.] told her [Father] yelled at her and told her it was all [E.]'s fault they got a divorce. [Father] also stated [E.] is the wors[t] kid ever and she is the reason they're all in this mess (referring to [CPS] and divorce.) [Father] also told [E.] if she tells her mom, [CPS], or her counselor then he will make her clean the entire house by herself and he will make her do all of the laundry. [Mother] stated [E.] came in the room crying to tell her everything and [E.] asked her not to tell anyone because her dad is going to punish her. [Mother] stated she doesn't know what to do at this point because she keeps records of everything but it seems as though the only way visitation could be supervised or for this to stop is if something else physically happens to the children. [Mother] stated he tells all of the kids not to listen or talk to their mom, counselor, or CPS because they're trying to take the children away from him. She stated [Father] manipulates the children and she believes he is building them back up again to start physically abusing them again if he has not already started and the children are just too afraid to say anything. I asked [Mother] if she knew why he was specifically targeting [E.] and she stated she's not sure but she believes it's because [E.] and her older brother w[ere] the most abused in their home and they would be considered as the weakest. She stated [J.] has fetal alcohol syndrome and he cannot speak as well as the others. She also stated [E.] was the most abused and she was in 5 different foster homes by the age of 2. [Mother] stated she asked [Father] multiple times if he wanted to just give the children back because he continued to abuse them and [Father] would tell her that he loved the children and he wanted the best for them by giving them tough love. [Mother] stated the children were already in a bad situation and for them to leave and come to an even worse situation. She stated she just wants [Father] to get the help they need so they can all move forward. She stated she is in counseling and she goes to a domestic violence group to help her heal. I told [Mother] I would speak to the supervisor in regards to her having concerns about the emotional abuse.

On August 30, 2019, Wilson reported,

There are concerns that [Father] is emotionally abusing the children. It was discussed if [Father] does not continue counseling then it could be a possibility he could become angry and lash out on the children. There is a court order in place and the children are required to go to [Father's] home every Thursday–Sunday. However, everyone is completing services and there ha[ve] not been any outcries of physical abuse.

Wilson also stated, "The case will be submitted for closure because [Mother] is being protective and there ha[ve] not been any recent outcries of abuse. The abuse that was mentioned occurred years ago before the case was called in."

On September 23, 2019, the day before Mother filed the petition for modification, Wilson reported that she spoke to Mother and asked Mother if she had any concerns for the children.

> She stated the children ha[ve] been out of control within the last two months. She stated the boys are telling her that they hate her, it's her fault for the divorce. The boys have also told her she is going to be homeless because dad pays for everything and she doesn't have a job. She stated the children do not talk to her and they now tell her they do not want to go to counseling. She stated the counselor told her the children do not open up anymore in their sessions. She stated [Father] is telling them these things because no child is going to randomly come up with those thoughts. I told her I did agree that someone is coaching the children. She stated her attorney is filing to modify the custody agreement to limit visitations for this reason. She stated [Father] is not spanking the children but he is still manipulating them and trying to get them to be against her for whatever reason. I told her it is difficult to speak with him because I do not want the children to suffer but I did need to address these concerns. She stated she just wants [everything] to stop because she use[d] to have a close relationship with the children and now she does not.

Wilson also spoke to the children. She described E.'s responses:

> I asked if she felt safe at her dad's house and she stated sometimes. I asked why she only felt safe sometimes and she stated because her dad gets a little crazy sometimes. I asked what happens when she gets in trouble at her dad's house. She stated her dad doesn't like when they tell other people things because then they'll get in trouble. I told [E.] what we speak about will stay between us. [E.] was very hesitant. She stated her dad yells a lot and he makes them do wall sits and squats. She stated he is not allowed to spank them anymore but he really wants to spank them. She stated her mom doesn't let her dad step one foot in the house and he was being dramatic when he came to the house. . . . I

–23–

asked [E.] if anyone ever tells her bad things and she stated her dad told her he has tried to apologize to their mom a lot of times but she doesn't accept his apology. She stated her dad has apologized to her for hurting her. I told her that was a good thing. It appeared as though [E.] wanted to tell me more but she stated her father gets mad when she talks about her feelings and when they do they get in trouble.

## The June 24, 2020 Hearing

At the June 24, 2020 hearing on Father's motion for attorney's fees under section 156.005, the district judge asked the amicus attorney for the children her position. The amicus attorney stated,

Judge, when I got in, in December, my understanding is I was instructed to investigate concerns for the children. And I did that. When we came back, there was report from Family Court Services that is on file with the Court.[4] And I ask the Court to take judicial notice with that. But the concern was just saying that statements from the children were that they didn't have any concerns with their dad. But there were concerns regarding the mom. And so everything kind of flowed from there, in terms of what happened next. So I just said: This is a case with seven children. They need both mother and father. And there is just nothing that I've seen that was concerning of father.

## Changed Circumstances

Mother argues she proved that when she filed the petition to modify on September 24, 2019, the children's circumstances had materially substantially changed since the trial court signed the divorce decree. *See* FAM. § 156.101(a)(1). Mother argues she presented evidence that Father physically and emotionally abused the children after the divorce decree was signed. The trial court found:

---

[4] This report is not in the appellate record.

–24–

28. Mother's assertion that CPS found ongoing physical and emotional abuse by Father is completely false.

29. Other than the 2016 incident, all other allegations by the Mother against the Father were "ruled out" by CPS. All of her claims of alleged on-going abuse were ruled out.

30. As to current allegations, the CPS Report found "[n]one of the other children in the home made an outcry of abuse or neglect."

The district judge's conclusions of law included:

1. At the time Petitioner filed her Petition to Modify, there was not evidence to support an allegation that the circumstances of either the child [sic] or a person affected by the order had materially and substantially changed since the Agreed Decree was rendered.

. . .

3. Petitioner's Petition to Modify lacked factual and legal support at the time of filing.

At the November 1, 2019 hearing before the associate judge, all the witnesses except Mother testified they did not know of any physical abuse to the children by Father occurring after the divorce decree.

The only incidents of physicality occurring after the divorce were Father's holding E.'s head into the pillow and Father's picking up L. under the arms, bruising and scratching him. Concerning the pillow incident, Brooks testified she did not know whether E.'s breathing was impaired by Father's action, and there is no evidence of how long he held her head in the pillow. Brooks testified that allegations occurring after the divorce "have all been ruled out," which the court could interpret as meaning CPS had determined the pillow incident did not constitute physical abuse. As for Father bruising and scratching L.'s chest, the evidence of that incident

–25–

is Mother's testimony, and Mother's and L's statements to the CPS employees who included Mother's and L's statements in their reports. Although Mother presented photographs of the bruise and scratch to the associate judge at the November 1, 2019 hearing, it does not appear those photographs were in evidence before the district judge at the hearing on June 24, 2020. There was no evidence of whether the bruise and scratch caused substantial pain to L. or whether they impaired him or limited his activities. The district judge could have concluded neither incident constituted a material and substantial change of the children's circumstances.

Brooks reported on May 30, 2019, that there were "serious concerns" about physical abuse of the three adopted children, E., J., and L., but the report does not indicate that these children had been physically abused after the divorce. Other statements by Brooks and Wilson indicate there was no physical abuse of the children after the divorce decree.

Concerning emotional abuse, Fry, Brooks, Wilson, and Mother testified at the November 1, 2019 hearing that they had concerns there was ongoing emotional abuse by Father. However, none of the witnesses specified what conduct by Father constituted emotional abuse. They testified there were signs that emotional abuse had occurred, including the children's refusing to speak ill of Father and J.'s bedwetting. J.'s bedwetting occurred before the divorce, and the district judge could conclude its continuance after the divorce was not a changed circumstance. Brooks and Wilson also testified and the CPS reports show statements by the children of

–26–

what Father had told them. None of the witnesses testified that any particular act or statement by Father constituted emotional abuse of a child.

The district judge could conclude that without evidence identifying the conduct by Father constituting emotional abuse and the date of that conduct being after the divorce, Mother failed to prove Father emotionally abused the children after the divorce. Although Mother testified to a change in the children's behavior after the divorce that she attributed to Father's conduct, the trial court was entitled to find her testimony not credible. None of the witnesses' testimony or the CPS reports that are independent of statements by Mother show marked changes in the children's behavior. The trial court could also have concluded that any change in the children's behavior was not a material or substantial change.

We conclude Mother has not shown the trial court abused its discretion by determining the children's circumstances had not substantially and materially changed since the divorce.

**Petition Frivolous or Designed to Harass**

Mother argues that even if she failed to prove the children's circumstances had changed, the trial court abused its discretion by imposing sanctions for filing the petition for modification because Father failed to prove she filed the petition in bad faith. Section 156.005 does not require the trial court to find the petition was filed in "bad faith." Instead, the statute requires the trial court to find the "suit for modification is filed frivolously or is designed to harass a party." FAM. § 156.005.

–27–

A suit is frivolous if it lacks a reasonable basis in the law or in the facts. *Kelsall*, 564 S.W.3d at 165. In this case, the trial court could conclude Mother knew her petition lacked a reasonable basis when she filed it. The only evidence of alleged physical abuse Mother presented occurring after the divorce was Father's pushing E.'s head into the pillow and his causing a bruise and scratch on L.'s chest. In the pillow incident, there was no evidence that E.'s breathing was impaired or that she suffered any lasting effects from the incident. In the bruising incident, there was no evidence that L. was impaired by the incident or suffered any lingering effects. The district judge could conclude Mother had no reason to believe when she filed her petition that these incidents materially or substantially changed either child's circumstances.

As for emotional abuse, the trial court could conclude that Mother presented no evidence of a material and substantial change to the children's circumstances from any emotional abuse. Although the CPS employees testified and reported they had concerns about ongoing emotional abuse by Father, the trial court could conclude that their testimony and reports did not demonstrate how the children's circumstances had changed as a result of any abuse. The three adopted children, E., J., and L. (the only children discussed at length in the testimony and CPS reports), all had problems with which they were coping before the divorce. E. had been homeless before being adopted, and J. and L. were born with fetal alcohol syndrome. The district judge could conclude Mother failed to present evidence showing their

circumstances had materially and substantially changed since the divorce, and that she had no evidence other than her own speculation and the conclusory statements of Fry and the CPS employees that any change was due to emotional abuse by Father. In this case, the district judge could reasonably conclude that Mother's petition was legally or factually groundless.

We conclude Mother has not shown the trial court abused its discretion by awarding Father his attorney's fees under section 156.005. We overrule Mother's issue on appeal.[5]

## CONCLUSION

Having concluded the trial court's decision to grant Father's motion under section 156.005 was not an abuse of discretion, we affirm the trial court's judgment.

/Lana Myers//

201032f.p05

LANA MYERS
JUSTICE

---

[5] "The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred." *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). Thus, opposing rulings can both be within a trial court's discretion. Although we have concluded that the trial court's ruling in this case awarding Father $5,000 of his attorney's fees under section 156.005 was not an abuse of discretion, this opinion should not be read as holding that the trial court's denial of Father's motion would have been an abuse of discretion.



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF T.R., L.R., J.R., S.R., E.R., C.R. AND V.R., CHILDREN

No. 05-20-01032-CV

On Appeal from the 255th Judicial District Court, Dallas County, Texas Trial Court Cause No. DF-18-06935. Opinion delivered by Justice Myers. Justices Osborne and Nowell participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 29th day of June, 2022.