

# NUMBER 13-23-00210-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

FROLAMO, LLC,                                                          Appellant,

v.

ARTURO ORTEGA, 3BU FAMILY
PARTNERSHIP, 533 PROPERTIES
JOINT VENTURE, KENNETH
HAUSENFLUCK, ALBERTO VELA,
FREEDOM BANK,                                                          Appellees.

## ON APPEAL FROM THE 370TH DISTRICT COURT
## OF HIDALGO COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Justices Silva, Peña, and Fonseca**
**Memorandum Opinion by Justice Peña**

Frolamo, LLC (Frolamo) appeals the trial court's no-evidence summary judgment

in favor of appellees Frost Bank, Freedom Bank, Alberto Vela, Kenneth Hausenfluck,

Arturo Ortega, 3BU Family Limited Partnership (3BU), and 533 Properties Joint Venture (533 Properties). By four issues, Frolamo argues that the trial court erred in granting no-evidence summary judgment as to four sets of its claims against various configurations of the appellees. We affirm the trial court's summary judgment as to Frolamo's unjust enrichment claim against Freedom Bank. We reverse the remainder of the judgment and remand for proceedings consistent with this opinion.

## I. BACKGROUND

According to Frolamo's second amended petition, Frost Bank, through its employee Bobby Goudge, contacted Ricardo Rubiano, a regular customer of Frost Bank, in late 2019 about purchasing real property being sold by Frost Bank located in Alamo, Texas (the Property). The Property included an existing bank branch with multiple offices, a motor banking facility, and parking spaces. Shortly thereafter, Rubiano formed Frolamo for the purpose of acquiring the Property and entered into a purchase and sale agreement with Frost Bank to purchase the Property for $3.5 million (the Frost Deal). According to Frolamo, it "diligently fulfilled its obligations under the Frost Deal contract by depositing $35,000 in earnest money"; "requisitioned a title commitment which the title company delivered on or about November 1, 2019"; and "spent substantial time developing and negotiating with tenants and potential tenants for the Property."

After learning that Frolamo had contracted to purchase the Property, Ortega, the president of Freedom Bank, contacted Frolamo "about purchasing a portion of the Property to serve as . . . Freedom Bank's headquarters, while [Frolamo] would retain the remainder of the Property and develop it as commercial property." According to Rubiano's unchallenged affidavit, Ortega originally reached out to him to purchase a portion of the

2

Property on behalf of Freedom Bank before deciding that his family limited partnership, 3BU, would purchase the bank building, and "3BU would then lease the [b]uilding to Defendant Freedom Bank." This so-called "3BU Deal" was entered into on or about January 31, 2020.

According to Frolamo, when making the 3BU Deal, Ortega represented that he was not interested in purchasing the entire Property, even though he had in fact already expressed interest to Frost Bank about purchasing the entire Property.[1] Frolamo and Freedom Bank also agreed to enter into a lease (the Freedom Lease) on or about February 28, 2020, according to which Freedom Bank would lease the first floor of the bank building to Frolamo for a period of ten years. According to Frolamo, this was an enforceable contract with performance required only if the 3BU Deal fell through, whereas Ortega claims that the Freedom Lease was a sham lease, that the only reason for executing it was so that Rubiano "could secure financing for his purchase of the Property," and that both Frolamo and "Freedom Bank agreed that the lease was not to be enforceable and was only being used to help [Frolamo] secure financing."

According to Frolamo, it had planned to secure financing to close the Frost Deal from Roger Moreno and Texas Community Bank, after which it would close the 3BU Deal. However,

> after discussions between Rubiano, Goudge and Ortega, the parties decided to arrange it so that the Frost Deal and 3BU Deal would close at the same time. This would allow Frolamo to use the proceeds from the 3BU

---

[1] The summary judgment evidence establishes that Arturo Ortega reached out to Frost Bank on or about December 12, 2019, to inquire about purchasing the entire Property. David Lane, Frost Bank's senior vice president, responded that the Property "and the building [are] currently under contract." On appeal, Ortega does not dispute that he expressed interest in purchasing the entire Property as early as December of 2019, but instead only argues that he never represented to Ricardo Rubiano that he was not interested in purchasing the entire Property.

Deal to fund the Frost Deal. Relying on this arrangement and the approval and agreement of Goudge and Ortega, Frolamo informed [Moreno] and Texas Community Bank that it would not need financing for the Frost Deal.

At all relevant times, the Defendants knew that[,] relying on Ortega's representations that the deal would close, Frolamo had terminated and stopped pursuing financing options for the Frost Deal.

On or about May 15, 2020, Ortega texted Rubiano that "we have gone completely cold on this deal" and informed Rubiano that he would not be purchasing the Property as part of the 3BU Deal and would not lease the building under the Freedom Lease. According to Frolamo, "[p]rior to this date, while acting with apparent authority from all entities, Ortega had led Rubiano to believe that the parties were proceeding under the terms of the contract." Unable to rely on the proceeds from the 3BU Deal to finance the Frost Deal, Frolamo asked for a six-month extension of the closing date on the Frost Deal, which Frost Bank rejected. Frolamo pulled out of the Frost Deal by email on June 17, 2020, because of the failure to secure financing.

3BU, Hausenfluck, and Vela formed 533 Properties as a general partnership, and after Frolamo was unable to close, 533 Properties purchased the Property from Frost Bank for $3.175 million. After learning of this purchase, Frolamo filed suit against appellees asserting the following causes of action: (1) a breach of contract claim against 3BU; (2) a breach of contract claim against Freedom Bank; (3) a tortious interference with contract claim against Ortega, 3BU, Hausenfluck, Vela, 533 Properties, and Freedom Bank; (4) a tortious interference with contract claim against Frost Bank; (5) a tortious interference with prospective contractual relations claim against Ortega, 3BU, and Freedom Bank; (6) a Chapter 27 fraud in real estate transactions claim against Ortega, 3BU, and Freedom Bank; (7) a common law fraud claim against Ortega, 3BU, and

4

Freedom Bank; (8) an agency and respondeat superior claim against all appellees; (9) a claim arguing for individual liability on behalf of a partnership or joint venture as against Ortega, Hausenfluck, Vela, 533 Properties, 3BU, and Freedom Bank; (10) an unjust enrichment claim against Frost Bank, Ortega, Hausenfluck, Vela, 533 Properties, and Freedom Bank; and (11) a constructive trust claim against Ortega, Hausenfluck, Vela, and 533 Properties.

Essentially, Frolamo argued in its various claims that Ortega entered into the 3BU Deal and the Freedom Lease with no intention of performing under those contracts. It asserted that Ortega's true intent was to make Frolamo reliant on Ortega for financing by agreeing to the simultaneous closing agreement so that Ortega could then sabotage the Frost Deal and then purchase the Property from Frost Bank outright at a lower price. According to Frolamo, Ortega's representations were intended to make Frolamo act to its own detriment, as part of Ortega's concerted efforts to sabotage the Frost Deal.

The appellees each filed a motion for no-evidence summary judgment, with Ortega, 3BU, and 533 Properties filing a joint motion. Additionally, Frost Bank filed a motion for traditional summary judgment. Frolamo filed several responses to appellees' summary judgment motions, including an omnibus response, which included evidence. Of particular note is the deposition testimony of Goudge, who stated that he considered Ortega and Rubiano to be competitors, that simultaneous closing arrangements were not uncommon in his experience, and that he had never previously dealt with a situation like the one here, "which is where you have a deal with Frolamo, Frolamo has a deal with [Ortega], [but Ortega] is contacting [Frost Bank] directly." Goudge also stated in his deposition that he was generally aware of the simultaneous closing arrangement between

5

Frolamo and Ortega, and that he may have spoken to Ortega about the simultaneous closing. Further, Goudge acknowledged that he was responsible for granting or denying Frolamo extensions of its closing date; conceded that he had previously granted Frolamo extensions based, in part, on the fact that Rubiano had a simultaneous closing arrangement in place; and stated that part of the reason he did not give Rubiano any further extensions is because Ortega had pulled out of the simultaneous closing arrangement.

The trial court considered each of the summary judgment motions by submission and granted them all by order. The trial court's order notes that it considered Frolamo's responses to the summary judgment motions and its summary judgment evidence. This appeal followed.[2]

## II.     STANDARD OF REVIEW & APPLICABLE LAW

We review a summary judgment order de novo. *See JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021). "[A] party may obtain a no-evidence summary judgment when 'there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial.'" *Id*. (quoting TEX. R. CIV. P. 166a(i)). "A properly filed no-evidence motion shifts the burden to the non[-]movant to present evidence raising a genuine issue of material fact supporting each element contested in the motion." *Id*. (first citing TEX. R. CIV. P. 166a(i); and then citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). However, the non-

---

[2] Frolamo does not challenge the granting of traditional summary judgment in favor of Frost Bank. Accordingly, after this appeal was filed, this Court granted a joint motion to sever Frost Bank so that the trial court's judgment against Frost Bank could become final. The remaining appellees have submitted three separate briefs, one on behalf of Ortega, 3BU, and 533 Properties (the Ortega appellees), one filed by Hausenfluck and Vela, and one filed by Freedom Bank.

movant is "not required to marshal its proof; its response need only point out evidence that raises a fact issue on the challenged elements." *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (internal quotation omitted).

"[A] no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact" as to each challenged element. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (first citing TEX. R. CIV. P. 166a(i); and then citing *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002)). "More than a scintilla of evidence exists when reasonable and fair-minded individuals could differ in their conclusions." *Moore v. Bushman*, 559 S.W.3d 645, 649 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex. 2003)). "Less than a scintilla of evidence exists if the evidence creates no more than a mere surmise or suspicion of a fact regarding a challenged element." *Id*. (citing *Forbes*, 124 S.W.3d at 172).

"[A] no-evidence motion for summary judgment must specifically state the elements as to which the defendant believes there is no evidence." *Ramirez v. GEICO*, 548 S.W.3d 761, 771 (Tex. App.—El Paso 2018, pet. denied) (citing *Diez v. Alaska Structures, Inc.*, 455 S.W.3d 737, 740 (Tex. App.—El Paso 2015, no pet.)). "The underlying purpose of this requirement 'is to provide the opposing party with adequate information for opposing the motion, and to define the issues for the purpose of summary judgment.'" *Id*. (quoting *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009)). "A no-evidence summary judgment motion 'must be specific in challenging the evidentiary support for an element of a claim or defense,' and 'conclusory motions or general no-

7

evidence challenges to an opponent's case' will be deemed insufficient to provide the requisite notice to the non-movant." *Id*. (quoting *Timpte*, 286 S.W.3d at 310).

Upon summary judgment review, we "tak[e] as true all evidence favorable to the non[-]movant and indulging every reasonable inference in the non[-]movant's favor." *JLB Builders*, 622 S.W.3d at 864 (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005)). "In our review, we consider all the summary judgment evidence in the light most favorable to the party against whom the no-evidence summary judgment was rendered, disregarding all contrary evidence and inferences." *Pandozy v. Shamis*, 254 S.W.3d 596, 599 (Tex. App.—Texarkana 2008, pet. struck) (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). To defeat a no-evidence summary judgment motion, "[b]oth direct and circumstantial evidence may be used to establish a material fact." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (citations omitted).

When the trial court "does not specify the grounds it relied upon in making its determination, reviewing courts must affirm summary judgment if any of the grounds asserted are meritorious." *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017). However, "[s]ummary judgment may not be affirmed on appeal on a ground not presented to the trial court in the motion." *State Farm Lloyds v. Page*, 315 S.W.3d 525, 532 (Tex. 2010) (citing *Stiles v. Resolution Tr. Corp.*, 867 S.W.2d 24, 26 (Tex. 1993)).

## III.    DISCUSSION

On appeal, Frolamo argues that the trial court erred in granting no-evidence summary judgment as to: (1) "its breach of contract claims against 3BU and Freedom

8

Bank"; (2) "its statutory and common law fraud claims against Ortega, 3BU, and Freedom Bank"; (3) "its claims for tortious interference with existing and prospective contractual relations"; and (4) "its claims for unjust enrichment and its pleading to impose a constructive trust."

## A.    Vicarious Liability

At the outset of our analysis, we consider whether summary judgment was proper on Frolamo's claims that the appellees were vicariously liable for Ortega's actions.

### 1.    Sufficiency of the No-Evidence Motions

In its second amended petition, Frolamo listed as two separate causes of action "Agency and Respondeat Superior (All Defendants)" and "Individual Liability on Behalf of a Partnership or Joint Venture (Ortega, Hausenfluck, 533 [Properties], 3BU, and Freedom Bank)." Frolamo argued under these headings that "[w]henever it is alleged that . . . Ortega committed any act or omission, it is also meant that he committed such acts or omissions as agents of Freedom Bank, 3BU, and/or 533 [Properties]," and that "3BU, Hausenfluck, and Vela, as partners and joint venturers of . . . 533 [Properties], are each jointly and severally liable for the debts and obligations of . . . 533 [Properties] incurred by . . . 3BU by and through the actions of its agent and principal, . . . Ortega."

On appeal, Frolamo argues that none of the appellees challenged these elements of his claims, and thus we cannot sustain summary judgment based on Frolamo's failure to produce evidence of them. On the other hand, the appellees argue that these portions of the second amended petition do not raise "standalone claim[s]" that appellees were required to challenge in their motions for summary judgment. While we agree with appellees that "Ortega's acts should be imputed only to various [appellees] as the

9

evidence allows," we cannot agree with them that the nature of no-evidence summary judgment motions absolves a party from referencing pleaded theories of vicarious liability at all. *See* TEX. R. CIV. P. 166a(i); *State Farm Lloyds*, 315 S.W.3d at 532. Rather, as to each appellee's no-evidence motion, the question is whether the motion provided Frolamo "with adequate information [to] oppose the motion, to define the issues" for the trial court to consider. *Timpte*, 286 S.W.3d at 311.

2.      **Ortega's Authority to Act on Behalf of Freedom Bank**

Unlike 3BU, 533 Properties, Hausenfluck, and Vela, Freedom Bank was not directly involved in the acquisition of the Property from Frost Bank. On appeal, Freedom Bank argues that Ortega's authority to act on its behalf in this case was solely limited to signing the Freedom Lease. Freedom Bank argues that

> Any promises made by [Ortega] pertaining to the 3BU Deal were not made on behalf of [Freedom Bank] because [Freedom Bank] was not a party to the 3BU Deal. Likewise, any discussions [Ortega] had with Frost [Bank] about purchasing the Property if [Ortega] did not close were not made on behalf of [Freedom Bank] because [its] singular role in these transactions is that of a tenant, not a prospective purchaser.

"An agent is one authorized by another to transact some business for the principal; the relationship is a consensual one between two parties, by which one party acts on behalf of the other, subject to the other's control." *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 782–83 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (cleaned up). "Authorization to act and control of the action are the two essential elements of agency." *Id*. at 783 (citing *Gonzales v. Am. Title Co.*, 104 S.W.3d 588, 593 (Tex. App.—Houston [1st Dist.] 2003, pet. denied)). "A principal is liable for the acts of another acting as its agent only when the agent has actual or apparent authority

10

to do those acts or when the principal ratifies those acts." *Id*. (citation omitted). "An agent's authority to act on behalf of a principal depends on words or conduct by the principal either to the agent (actual authority) or to a third-party (apparent authority)." *Id*. (citation omitted). A principal grants an agent actual authority to act on the principal's behalf when the principal (1) intentionally authorizes the agent, (2) intentionally allows the agent to believe it has authority, or (3) through lack of due care allows the agent to believe it has authority. *Id*. When determining whether a party had actual authority to act on behalf of another, courts examine the words and conduct used by the principal to the alleged agent. *Id.* "Apparent authority arises either from (1) a principal knowingly permitting an agent to hold himself out as having authority, or (2) a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority he purports to exercise." *Id*. at 784.

We disagree with Freedom Bank that there is no evidence that Ortega had apparent authority to act on its behalf beyond the signing of the Freedom Lease. In direct response to Freedom Bank's no-evidence summary judgment motion, Frolamo provided Rubiano's unchallenged affidavit, which provides that "Ortega initially called [him] to say he wanted to buy the building for a bank branch[; d]uring this conversation he said the bank had to own the building, the same way Frost had owned the building." According to Rubiano, "[a]fter [they] had already drafted a Purchase and Sale Agreement conveying the property from Frolamo to Freedom Bank, Ortega asked to change the identity of the purchasing party to 3BU." After this point, the two discussed and signed the Freedom Lease. In his affidavit, Rubiano states that he believed the various communications with Ortega from his official Freedom Bank email address were conducted on behalf of

11

Freedom Bank because Ortega had originally approached him on behalf Freedom Bank to purchase the building. Moreover, "Ortega did not send [him] any emails indicating that he was acting in his individual capacity when he emailed [Rubiano] from his Freedom Bank email address." Frolamo's summary judgement evidence included these numerous emails whose content was not limited to discussions of the Freedom Lease. Further, on March 30, 2020, Ortega signed a letter "on behalf of Freedom Bank" concerning the application of AOB Ventures, Freedom Bank's holding company, for approval of a bank branch from the Texas Department of Banking (TDB). Also, in a section of the application entitled "Bank Insiders," Ortega affirmed that the branch would be purchased by an individual bank insider with an ownership interest, and named himself as that individual. Accordingly, to the extent the trial court granted Freedom Bank's summary judgment motion on grounds that there was no evidence Ortega had authority to act on its behalf beyond entering into the Freedom Lease, that ruling was erroneous. *See Merrell Dow Pharms.*, 953 S.W.2d at 711 (noting that when construing evidence in the light most favorable to the non-movant, "every reasonable inference deducible from the evidence is to be indulged in that party's favor").

**B.    Breach of Contract**

By its first issue, Frolamo contends the trial court erred by granting summary judgment on its breach-of-contract claims. "The essential elements of a breach-of-contract claim are (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Purvis v. Stoney Creek Cmty. Ass'n, Inc.,* 631 S.W.3d 287, 291 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (citation

12

omitted); *see also S & S Emergency Training Sols., Inc. v. Elliott*, 564 S.W.3d 843, 847 (Tex. 2018). Further, where a party to the contract repudiates or anticipatorily breaches a contract by disavowing any intention to perform under the contract in the future, the injured party's performance under the contract is excused. *See Sci. Mach. & Welding, Inc. v. FlashParking, Inc.*, 641 S.W.3d 454, 463 (Tex. App.—Austin 2021, pet. denied). "Repudiation is accomplished by a contracting party's words or actions indicating it is not going to perform the contract in the future," and "[a] party may repudiate a contract either expressly or by a material breach." *Med. Imaging Sols. Group, Inc. of Tex. v. Westlake Surgical, LP*, 554 S.W.3d 152, 158 (Tex. App.—San Antonio 2018, no pet.) (citations omitted).

### 1. Ortega and 3BU

In their motion for no-evidence summary judgment, the Ortega appellees contested each of the four aforementioned essential elements of Frolamo's breach of contract claim. *See Purvis*, 631 S.W.3d at 291; *Ramirez*, 548 S.W.3d at 771. The issue here is complicated by the fact that, although there was a written contract between Frolamo and 3BU, Frolamo also argues that there was an additional agreement with 3BU and Frost Bank that there would be simultaneous closings which would allow Frolamo to use the proceeds from the 3BU Deal to finance the Frost Deal. Ortega and 3BU argue that there was never such an agreement regarding simultaneous closings, and that when Ortega texted "we have gone completely cold on this deal," he was not repudiating the contract; rather, he was merely acknowledging the fact that Frolamo could no longer satisfy its obligations under the contract. Ortega and 3BU note that, under the contract, Frolamo failure to obtain financing invoked a requirement that he subdivide the property

13

at least thirty days before closing, and that closing could in no event occur 120 days from the date of execution of the contract, which would be May 30, 2020. Ortega and 3BU point to this deadline, and a corresponding provision in the contract that amendments must be in writing, to argue that Frolamo cannot show that it either performed its obligations under the contract (because it failed to timely subdivide the property) or that 3BU, through Ortega, repudiated the contract, (as his text message about the deal going "cold" was merely an acknowledgment that Frolamo had failed to satisfy its end of the contract, resulting in its natural termination).[3]

The problem with this argument is that Frolamo's timely subdivision of the Property does not touch on any essential element of a breach of contract claim. Frolamo's live petition alleged in part that Ortega breached the contract by repudiating it in his May 15, 2020, text message. Ortega and 3BU's arguments amount to an "assertion that it [was] excused from further performance because of the other party's prior material breach," which "is an affirmative defense that must be pleaded and proved." *Earth Power A/C & Heat, Inc. v. Page*, 604 S.W.3d 519, 524 (Tex. App.—Houston [14th Dist.] 2020, no pet.); *Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C.*, 470 S.W.3d 636, 646 (Tex. App.— Dallas 2015, no pet.) ("The contention that a party to a contract is excused from

---

[3] This rationale is not consistent with Ortega's deposition testimony. During his deposition, Ortega stated that Frolamo had breached the contract much earlier because of certain "misrepresentations" and because "there were some deadlines that [Rubiano] did not fulfill." For example, Ortega argues that Frolamo was in default ten days after executing the contract because Frolamo did not timely secure a title commitment. Ortega's course of conduct in excusing alleged defaults by Frolamo provides at least some evidence to support the inference that the May 15, 2020, text message was a repudiation of the contract, as opposed to Ortega and 3BU's interpretation of the text as a mere acknowledgment that Frolamo's performance under the contract was impossible. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (noting that under summary judgment review, "[b]oth direct and circumstantial evidence may be used to establish any material fact" (citations omitted)).

performance because of a prior material breach by the other contracting party is an affirmative defense that must be affirmatively pleaded."); *see* TEX. R. CIV. P. 94; TEX. R. CIV. P. 166a(i) (providing that no-evidence summary judgment may be sought only on "a claim or defense on which an adverse party would have the burden of proof at trial"). However, prior material breach was not pleaded by either Ortega or 3BU, nor did they raise this argument in their motion, or otherwise put Frolamo on notice that they were alleging that Ortega's text could not have constituted a repudiation of the 3BU Deal because the contract had already terminated by virtue of Frolamo's inability to timely subdivide the Property. *See Timpte*, 286 S.W.3d at 311 (analogizing Rule 166a(i)'s specificity requirement to the "fair notice" pleading requirement and noting its purpose "is to provide the opposing party with adequate information [to] oppose the motion, and to define the issues" for summary judgment). Accordingly, we cannot affirm summary judgment on these grounds. *See State Farm Lloyds*, 315 S.W.3d at 532; *Blackstone Med., Inc.*, 470 S.W.3d at 646; *see also* TEX. R. CIV. P. 166a(i).

On appeal, Ortega and 3BU's argument is limited to whether Ortega's text message amounted to repudiation, and whether Frolamo had partially performed. However, having found that Ortega's text message could have amounted to repudiation, which would excuse performance, we need not address their other argument. Accordingly, as to the 3BU Deal, there is more than a scintilla of summary judgment evidence to raise a genuine issue of material fact as to the essential elements of breach of contract.[4]

---

[4] Thus, we need not address whether time was of the essence under the contract or whether such requirement had been waived by Ortega's conduct, such as his April 10, 2020, email stating that he

15

## 2.       Freedom Bank

Frolamo argues that Freedom Bank's no-evidence motion was insufficiently specific to satisfy Rule 166a(i), which provides that "[t]he motion must state the elements as to which there is no evidence." TEX. R. CIV. P. 166a(i); *see Ramirez*, 548 S.W.3d at 771. Rule 166a(i) requires that no-evidence motions "be specific in challenging the evidentiary support for an element of a claim or defense." TEX. R. CIV. P. 166a, 1997 cmt. Conclusory motions or general no-evidence challenges to an opponent's case are legally insufficient. *See Timpte*, 286 S.W.3d at 310. Such a motion is "fundamentally defective and cannot support summary judgment as a matter of law." *Jose Fuentes Co., Inc. v. Alfaro*, 418 S.W.3d 280, 283 (Tex. App.—Dallas 2013, pet. denied) (citations omitted). "A no-evidence motion for summary judgment may be directed at specific factual theories or allegations within a claim or defense *only* if the challenge to the factual allegation is connected to a no-evidence challenge to a specified element of a claim or defense." *Id.* (citations omitted). As the Texas Supreme Court has explained:

> We have called for strict enforcement of this requirement. . . . Thus, a no-evidence motion that lists each element of the plaintiff's claim and then asserts that the plaintiff has no evidence to support "one or more" or "any of" those elements is insufficient to support summary judgment because this language does not clearly identify which elements, whether some or all, are challenged.

---

"need[ed] a new contract or extension," which was sent after Ortega submitted the Texas Department of Banking (TDB) application on behalf of Freedom Bank. *See, e.g.*, *Lopez v. Garbage Man, Inc.*, No. 12-08-00384-CV, 2011 WL 1259523, at *11 (Tex. App.—Tyler Mar. 31, 2011, no pet.) (mem. op.) ("Ordinarily, time is not of the essence of a contract, and failure to perform on the exact date agreed upon is not such a breach that justifies a cancellation." (citing *Laredo Hides Co. v. H & H Meat Prods. Co.*, 513 S.W.2d 210, 216 (Tex. App.—Corpus Christi–Edinburg 1974, writ ref'd n.r.e.)); *Kennedy Ship & Repair, L.P. v. Pham*, 210 S.W.3d 11, 20 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ("A waiver of time of performance of a contract will result from any act that *induces* the opposite party to believe that exact performance within the time designated in the contract will not be insisted upon." (quoting *Laredo Hides*, 513 S.W.2d at 218)).

16

*Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 695–96 (Tex. 2017).

We agree with Frolamo that Freedom Bank's no-evidence summary judgment motion was legally insufficient. Although Freedom Bank listed the elements of a breach of contract claim, the motion failed to "state the elements as to which there is no evidence." TEX. R. CIV. P. 166a(i). Rather, after listing the breach-of-contract elements, the motion only provides as follows:

> [Frolamo] has no evidence to support its breach of contract claim, particularly [Frolamo] cannot show the necessary preconditions ever occurred (those preconditions being [Frolamo] becoming the owner of the [P]roperty and the lease agreement being approved by [TDB]). Defendant Freedom Bank pled the affirmative defense of failure of consideration in response to Plaintiff's breach of contract. In the alternative or in addition to the affirmative defense of failure of consideration, Defendant Freedom Bank [pled] the affirmative defense of lack of consideration.

Freedom Bank failed to specifically mention any particular element of a breach-of-contract claim; rather, it generally referred to Frolamo's inability to provide evidence of its "breach of contract claim." *See, e.g.*, *Callaghan Ranch, Ltd. v. Killam*, 53 S.W.3d 1, 3–4 (Tex. App.—San Antonio 2000, pet. denied) ("The appellees' motion stated: 'The Killams are entitled to summary judgment because the Plaintiffs cannot by pleading, deposition, answers to interrogatories or other admissible evidence demonstrate there is any evidence to support the declaratory judgment seeking to declare the road in question a public thoroughfare.' The motion then generally challenges Callaghan Ranch's factual allegations. The motion fails to state the elements of Callaghan Ranch's causes of action as to which there is no evidence; therefore, it is legally insufficient as a matter of law."); *Meru v. Huerta*, 136 S.W.3d 383, 387 (Tex. App.—Corpus Christi–Edinburg 2004, no pet.) ("Appellees' motion for summary judgment does not state the elements of the claim as to

17

which there is no evidence. Appellees' demand 'that Plaintiff show evidence at this time' is nothing more than a 'conclusory' motion or 'general' no-evidence challenge, which the rule specifically prohibits."); *cf. Hernandez v. Vazquez*, 656 S.W.3d 589, 593 (Tex. App.— El Paso 2022, no pet.) (finding that Rule 166a(i)'s specificity requirement was met where the "motion lists the elements of every one of [non-movant]'s causes of action and alleges [they] cannot produce any evidence of any of *those elements*" (emphasis added)).

In its brief, Freedom Bank argues that by stating that Frolamo "cannot show that the necessary preconditions ever occurred," Freedom Bank was challenging the existence of a valid contract. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018) ("A plaintiff asserting a breach-of-contract claim must prove (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach."). We disagree. Frolamo's live petition clearly states that "the Freedom Lease was a valid contract and that [Frolamo] had performed or tendered performance at the time Freedom Bank materially breached and anticipatorily breached the contract." However, Freedom Bank's summary judgment motion did not specifically allege that there was no evidence of the existence of a contract, they only challenged its validity. Therefore, Freedom Bank's reference to Frolamo's failure to satisfy certain "preconditions" is unconnected to any challenge to a specific element of Frolamo's breach-of-contract claim. *See Jose Fuentes*, 418 S.W.3d at 283 (noting that a movant may contest factual allegations in a no-evidence summary judgment motion only when they are related to a challenged element of a claim).

18

Furthermore, to the extent that Freedom Bank argues that the failure of Frolamo to satisfy certain conditions precedent excused its performance under the contact, that would be an affirmative defense which was not asserted. *See Blackstone Med., Inc.*, 470 S.W.3d at 646; *see also* TEX. R. CIV. P. 94.

For all the above reasons, we sustain Frolamo's first issue.[5]

## C.    Statutory Fraud

By part of its second issue, Frolamo contends the trial court erred by granting no-evidence summary judgment on its statutory fraud claim. Texas Business and Commerce Code "[§] 27.01 applies to false misrepresentations or promises made to induce another to enter into a contract for the sale of real property or stock." *Tukua Invs., LLC v. Spenst*, 413 S.W.3d 786, 796 (Tex. App.—El Paso 2013, pet. denied) (citation omitted). "The statute does not specify that an actual conveyance of real estate must occur, and as such, a contract to convey constitutes a real estate transaction under [§] 27.01." *Id*. at 796–97 (citations omitted).

> To succeed on a [§] 27.01 fraud claim a plaintiff must show that: (1) a representation of a material fact was made; (2) the representation was false; (3) the representation was made to induce a party to enter a contract; (4) the party relied upon that representation when making the contract; and (5) the false representation caused an injury.

*Id*. at 798 (citation omitted); *see* TEX. BUS. & COM. CODE ANN. § 27.01(a).

"A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." *Formosa*

---

[5] Freedom Bank agrees with Frolamo that its self-described "affirmative defenses" of "failure of consideration" and "lack of consideration" could not serve as the basis of the trial court's no-evidence summary judgment. Accordingly, we do not consider whether the trial court's judgment was proper on these grounds. *See* TEX. R. APP. P. 47.1.

*Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) (citation omitted). Because "intent to defraud is not usually susceptible to direct proof," a party can support a claim for fraudulent inducement where there is evidence of "breach combined with 'slight circumstantial evidence' of fraud." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006) (citing *Spoljaric*, 708 S.W.2d at 435).

Essentially, Frolamo's statutory fraud claim is that Ortega, individually and on behalf of 3BU and Freedom Bank, induced Frolamo to enter into both the 3BU Deal contract and the Freedom Lease by (1) falsely representing that Ortega and 3BU "would close the 3BU Deal and purchase the property from Frolamo," and (2) falsely representing on behalf of Freedom Bank "that they would honor the Freedom Lease and lease the building from Frolamo if the 3BU [D]eal fell through." Underlying these representations is Ortega's false representation that he desired to purchase only a portion of the Property. *See, e.g.*, *Lake v. Cravens*, 488 S.W.3d 867, 892 (Tex. App.—Fort Worth 2016, no pet.) (finding a statutory fraud claim to be supported by legally and factually sufficient evidence where a doctor entered into a development agreement, testified that the inducing party falsely represented that he had previously developed and overseen the development of a hospital, and "clarified at trial that he was complaining about representations that were *not* addressed in the [agreement] but that induced him to enter into it, i.e., [the inducing party's] representations about his past experience").

20

### 1. Ortega and 3BU

In one of his affidavits, Rubiano averred that when he originally entered into a purchase and sale agreement with Frost Bank in 2019, he "included . . . Ortega and Freedom Bank in the deal as they were going to open a new branch of Freedom Bank at the [P]roperty," and he and Ortega "agreed that [the] subject [P]roperty would be subdivided and Ortega would purchase the bank portion of the building from" Rubiano. Further, in an email on January 22, 2020, days before the parties signed the 3BU Deal contract, Rubiano informed Ortega that he needed "a promise from [him] that [he] will close" so that he can secure proper financing.[6]

Frolamo argues that Ortega and 3BU entered into the 3BU Deal without any intent of performing under the contract, *see Formosa Plastics Corp*, 960 S.W.2d at 48, and misrepresented their intentions for the Property in order to gain intimate knowledge about the Frost Deal in furtherance of their ultimate goal of purchasing the Property directly from Frost Bank outright at a lower price. In its live petition, Frolamo alleged that "Ortega advised Rubiano that Freedom Bank was not interested in the portion of the Property that housed a large motor bank," and that this "provide[s] a basis here to infer . . . fraudulent intent." As Frolamo acknowledges in its briefing, there is no summary judgment evidence

---

[6] This constitutes more than a scintilla of evidence that Ortega was aware of the simultaneous closing agreement prior to the execution of the 3BU Deal contract. Accordingly, the trial court erred if it granted no-evidence summary judgment on grounds that that the alleged simultaneous closing agreement was not agreed upon until after the signing of the 3BU Deal contract, as Ortega and 3BU contend on appeal. *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *cf. W. Loop Hosp., LLC v. Hous. Galleria Lodging Assocs., LLC*, 649 S.W.3d 461, 487–88 (Tex. App.—Houston [1st Dist.] 2022, pet. denied) ("The remainder of the sellers' fraud claims are all based on alleged misrepresentations that occurred after the parties signed the Purchase Agreement and caused the sellers to expend additional earnest money fees to extend the closing date on the contract with Mody. Because these claims all concern representations allegedly made *after* execution of the Purchase Agreement, these claims are not claims for fraudulent inducement of the contract."). Regardless, this argument was not raised in their motion for summary judgment.

wherein Rubiano "expressly articulated" his understanding "that Ortega lacked interest in purchasing the entire [P]roperty." Frolamo argues, however,

> a jury could readily infer from Ortega's conduct while the 3BU [D]eal was in place and after it had been terminated that Ortega's intention was to obtain the entirety of the [P]roperty . . . [and a] reasonable finding drawn from that inference is that Ortega acquiesced to simultaneous closings precisely because he knew that structure would permit him an opportunity to obtain the whole [P]roperty in the aftermath of Frolamo's inability to close. That is more than a mere scintilla of evidence of fraudulent intention.

We agree with Frolamo. Having found more than a scintilla of evidence that there was a breach of the 3BU Deal contract, we further conclude that such evidence of breach, combined with the summary judgment evidence produced by Frolamo, supports the conclusion that Ortega and 3BU had no intention of performing on the contract when it was entered into, and that Ortega falsely misrepresented his interest in the Property. *See Formosa Plastics Corp.*, 960 S.W.2d at 48; *Tony Gullo Motors I, L.P.*, 212 S.W.3d at 305. In particular, the summary judgment evidence shows: Ortega reached out to Frost Bank in 2019 interested in purchasing the entire Property; Ortega was informed that the Property was already under contract before he reached out to Rubiano; Ortega and 3BU entered into a contract with Frolamo to purchase only a portion of the Property; Goudge acknowledged that Rubiano and Ortega were considered competitors; Goudge stated that simultaneous closings were common in the industry; Goudge stated that he was generally aware of the simultaneous closing agreement and may have spoken to Ortega about it; Goudge stated that he had never had an individual already involved in a contract with a third party over a certain property unilaterally contact him the way Ortega did; Goudge stated that he understood that Ortega backing out of the 3BU Deal would likely result in Frolamo being unable to close the Frost Deal; and before the expiration of the

22

3BU Deal contract, Ortega reached out to Frost Bank stating that he had "a deal to buy the old [A]lamo [B]ank bran[ch] from a third party that is buying it from [F]rost [Bank]," and that he was "afraid [Rubiano] has run into some issues and [he] [did] not want to lose the deal due to [Rubiano's] inability to close." After Ortega texted Rubiano that the deal had gone "cold," and before the closing deadline of the Frost Deal, Ortega again reached out to Frost Bank to ask about the status of Frolamo's closing, to which David Lane, Frost Bank's senior vice president, responded as follows:

> I talked to . . . Goudge earlier this morning about the pending sale of the building. [Goudge] said the closing date was moved but he did not give any details. The new closing date is in a couple of weeks. If the sale does not close, I do not anticipate any extensions and I have asked [Goudge] to call you to see if you have any interest in the building. I have put on my calendar to touch base with [Goudge] to confirm the building closed.[7]

Ortega and 3BU argue that "[t]o the extent Ortega's inquiry to Frost Bank evidences an interest in buying the entire [P]roperty from Frost Bank rather than just part of it," "it is just as likely that it shows intent to buy only so much of the [P]roperty as was necessary for his goals." *See Wal-Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 936 (Tex. 1998) ("[M]eager circumstantial evidence from which equally plausible but opposite inferences may be drawn is speculative and thus legally insufficient to support a finding."). We disagree. In particular, Goudge testified that: (1) Ortega and Rubiano were considered competitors; (2) he had never had a party involved in a contract concerning a

---

[7] Frolamo presented evidence of Frost Bank's own guidelines with respect to confidentiality, which provided that Frost Bank's "business, directors, officers, and employees often learn confidential and proprietary information about [Frost Bank], its customers, its suppliers, or other parties," and that "[d]irectors, officers, and employees must maintain the confidentiality of all information so entrusted to them except when disclosure is authorized or legally mandated." Pressed during his deposition whether his communications with Ortega violated the relevant rules of confidentiality, Lane stated: "Right now I'm not sure. I'm not sure. Okay."

23

certain property unilaterally contact Frost Bank to inquire about a pending closing and to express interest in purchasing the property without the other involved party; and (3) "when it comes to Ortega himself in either being a part of the deal with the contract he had with Frolamo or purchasing the [Property] all by himself, he was always consistent [that] he wanted the [P]roperty all to himself." Because we must consider all the evidence in the light most favorable to Frolamo, *Pandozy*, 254 S.W.3d at 599, and because we may infer intent "from a party's subsequent acts after the representation is made," *Spoljaric*, 708 S.W.2d at 434, we conclude that Frolamo has provided more than a scintilla of circumstantial evidence to support inferences that (1) Ortega made a material misrepresentation when he promised to close the 3BU Deal and purchase the Property from Frolamo, and (2) the misrepresentations were made to induce Frolamo to enter into the 3BU Deal and the Freedom Lease. *See Tukua Invs.*, 413 S.W.3d at 798; *Tony Gullo Motors I, L.P.*, 212 S.W.3d at 305.

### 2. Causation

Ortega and 3BU argue that even if there were evidence of fraudulent intent, Frolamo has no evidence to establish the causation element. *See Tukua Invs.*, 413 S.W.3d at 798. Specifically with respect to the Frost Deal, Ortega and 3BU argue that "Frolamo does not have evidence that the Frost Deal would have closed even if [Rubiano] had told 3BU and Ortega about his extra-contractual agreement and even if he obtained their willing participation in that agreement."

We disagree. Here, the crucial evidence in support of causation is Goudge's deposition testimony, wherein he states that: (1) he was responsible for deciding whether to grant an extension; (2) he was aware of the simultaneous closing agreement; (3) he

24

knew that Ortega was interesting in purchasing the entire Property before denying Frolamo's six-month extension request, and (4) his decision not to extend Frolamo's closing date so as to allow Rubiano more time to secure financing was due, in part, to the fact that Ortega had backed out of the 3BU Deal. For example, Goudge responded affirmatively to the following question:

> [T]he reason you didn't give [Rubiano] six months is because you knew that a substantial part of the way he was going to pay you was . . . the simultaneous closing that had been true all along until [Ortega] pulled out of the deal. Now [Ortega] is out of the deal, and that certainly played in your mind why you didn't want to grant him six months?[8]

Further, Goudge acknowledged that Ortega pulling out of the simultaneous closing agreement would have made it "[h]ighly unlikely" that Frolamo would be able to timely close on the Frost Deal. Lastly, Goudge and Ortega spoke before the expiration of the Frost Deal contract with Frolamo, and Frost Bank's broker contacted Ortega about purchasing the entire Property a mere five days after the closing date of the Frost Deal had elapsed.

Viewing all the evidence in the light most favorable to Frolamo, *see Pandozy*, 254 S.W.3d at 599, we conclude that Frolamo has presented more than a scintilla of evidence to support the element of causation. Given the other circumstantial evidence in the case, *see Ridgway*, 135 S.W.3d at 601, it is reasonable to infer that Frost Bank's failing to grant Frolamo an extension so as to allow it more time to close on the Frost Deal was caused by Ortega's allegedly false representations that he would close on the 3BU Deal and that

---

[8] As Bobby Goudge elsewhere stated, the fact that Ortega had agreed to purchase a portion of the Property from Frolamo would impact his decision with respect to extensions because "it gives credence that [Rubiano has] got something—that [he] has a deal working that would assist him to close. So it would make sense to give him a little more time if he was still trying to get financing or whatever in order to make the deal happen."

25

he would follow through on the Freedom Lease if he were not able to close on the 3BU Deal. *See, e.g.*, *Formosa Plastics Corp.*, 960 S.W.2d at 49 ("This testimony provides more than a scintilla of evidence supporting Presidio's contention that Formosa intentionally made representations that it never intended to keep in order to induce Presidio to enter into the contract at a low bid price and that Presidio relied on these misrepresentations to its detriment. Thus, legally sufficient evidence supports the jury's fraud finding.").

3.      **Freedom Bank**

Unlike the portion of Freedom Bank's motion attacking Frolamo's breach-of-contract claim, Freedom Bank specifically stated in its no-evidence motion for summary judgment that Frolamo "has no evidence to show any of the elements . . . relating to a claim for Chapter 27 real estate fraud," and specifically referred to the elements of the claim "set forth above." *See Tukua Invs.*, 413 S.W.3d at 798.

In one of his affidavits, Rubiano stated that Ortega first contacted him expressing interest in purchasing a portion of the Property on behalf of Freedom Bank, and that Ortega would consistently email him from his official Freedom Bank email address. During his deposition, Rubiano stated that Ortega, on behalf of Freedom Bank, "entered into a lease agreement in the event that [the] purchase/sale agreement [for the 3BU Deal] did not transpire, and then strung along that purchase/sale agreement until there was no time left to be able to properly deliver the space." His affidavit testimony likewise establishes that he "made sure Ortega was aware that the lease between Frolamo and Freedom Bank was a real, enforceable lease that would only be enforced if Ortega or one of his entities failed to close on the [P]roperty." Frolamo also produced a copy of the lease, which lists "Freedom Bank, a Texas state bank" as the tenant, and which is signed by Ortega.

26

Ortega, throughout the litigation, took the position that the Freedom Lease was unenforceable and that he entered into it only so that Rubiano could use it in order to secure financing. However, we must view the evidence in the light most favorable to Frolamo. *See Pandozy*, 254 S.W.3d at 599; *see also In re Marriage of Braddock*, 64 S.W.3d 581, 587 (Tex. App.—Texarkana 2001, no pet.) ("It is not an unreasonable inference to conclude that a person who makes an agreement and later denies its existence never intended to fulfill the agreement in the first instance."). As Frolamo argues, the evidence shows that the Freedom Lease was part of the larger simultaneous closing arrangement, according to which Frolamo would still be able to secure alternative financing and rely on the Freedom Lease when doing so if the 3BU Deal fell through. We conclude this constitutes more than a scintilla of evidence to establish that: (1) if not for Ortega's representations about leasing the Property as a contingency or fail-safe, Frolamo would not have entered the lease; and (2) Freedom Bank, through Ortega, had no intention of ever leasing the Property. *See Formosa Plastics Corp.*, 960 S.W.2d at 48 ("A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made.").

We acknowledge that there is some contrary evidence. In particular, in an email dated January 22, 2020, Ortega emailed Rubiano telling him that he "ha[s] no intention of leasing, [he] need[s] to purchase [the Property] only." This may support Ortega's claim that the lease was a sham to secure financing, which Ortega only signed at the request of Rubiano. However, Ortega's email was sent more than a month before the lease was signed, and the lease itself evinces Ortega's contemporaneous intent that the lease be enforceable. For example, the lease names Freedom Bank as the tenant, it was signed

27

by Ortega, and Ortega hand wrote into the lease agreement the following additional provision: "This lease is entirely contingent on Freedom Bank obtaining regulatory . . . approval to open branch in Alamo. No approval, no lease." Regardless, we must view the evidence in the light most favorable to Frolamo, "disregarding all contrary evidence and inferences." *See Pandozy*, 254 S.W.3d at 599.

Accordingly, we conclude that Frolamo has presented more than a scintilla of evidence that Freedom Bank, through Ortega, falsely represented that it would lease a portion of the Property from Frolamo if the 3BU Deal fell through, and that this misrepresentation was made to induce Rubiano into signing the Freedom Lease. *See Formosa Plastics Corp.*, 960 S.W.2d at 48; *Pandozy*, 254 S.W.3d at 599.

**D.    Common Law Fraud**

The elements of common law fraud are as follows:

(1) the defendant 'made a material representation that was false'; (2) the defendant 'knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth;' (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result.

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (quoting *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins.*, 51 S.W.3d 573, 577 (Tex. 2001)). "A cause of action for statutory fraud differs from the common law cause of action only in that it does not require proof that the false representation was made knowingly or recklessly." *Robbins v. Capozzi*, 100 S.W.3d 18, 26 (Tex. App.—Tyler 2002, no pet.) (citation omitted).

Having found that Frolamo has presented evidence to raise a genuine issues of

28

material fact on its statutory fraud claims, we also conclude that Frolamo has presented more than a scintilla of evidence to sustain its common law fraud claims. In particular, Frolamo presented more than a scintilla of evidence as to the only issue distinguishing common law fraud from statutory fraud—i.e., whether Ortega had the requisite state of mind when he made the alleged misrepresentations. *See Robbins*, 100 S.W.3d at 26. In particular, as set forth above, there was evidence establishing that Ortega made representations that he never intended to keep in order to induce Frolamo to enter into the 3BU Deal and the Freedom Lease to its detriment. *See, e.g., Formosa Plastics Corp.*, 960 S.W.2d at 49 (finding evidence legally sufficient to sustain common law fraud where there was more than a scintilla of evidence establishing that "Formosa intentionally made representations that it never intended to keep in order to induce Presidio to enter into the contract at a low bid price and that Presidio relied on these misrepresentations to its detriment").

We sustain Frolamo's second issue.

## E. Tortious Interference with Existing Contract

### 1. Ortega, 3BU and 533 Properties

By its third issue, Frolamo contends the trial court erred by granting no-evidence summary judgment on its tortious interference with existing contract claims. To sustain such a claim, a plaintiff must prove that "(1) a contract subject to interference exists, (2) the defendant committed a willful and intentional act of interference with the contract, (3) the act proximately caused injury, and (4) the plaintiff sustained actual damages or loss." *Vertex Servs., LLC v. Oceanwide Hous., Inc.*, 583 S.W.3d 841, 853 (Tex. App.— Houston [1st Dist.] 2019, no pet.) (first citing *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d

572, 588 (Tex. 2017); and then citing *Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 361 (Tex. App.—Houston [1st Dist.] 2013, pet. denied)). "[A] claim for tortious interference with a contract accrues at the time a contracting party knows the nature of the injury and the damages, regardless of whether the contract is terminated at that time." *Rincones*, 520 S.W.3d at 591. A plaintiff must show that the interfering party "'had actual knowledge of the contract or business relation in question, or knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the contract or business relationship.'" *Moore*, 559 S.W.3d at 652 (quoting *Steinmetz & Assocs., Inc. v. Crow*, 700 S.W.2d 276, 278 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.)). Further,

> [t]ortious interference encompasses not only actual inducement of a breach of contract but also other invasions of contractual relations. Accordingly, actionable interference includes any act which retards, makes more difficult, or prevents performance. Although the act of interference need only make performance more difficult to establish damage to the plaintiff, the defendant's intent must have been to effect a breach of the contract.

*Id.* at 651.

For the same reasons Frolamo's breach of contract and fraud claims survive no-evidence summary judgment, so too do its tortious interference with existing contract claims. In *Moore*, the plaintiffs sued their neighbors, the Bushmans, alleging that the Bushmans interfered with their insurance contract by calling State Farm after a theft on the Moores' property and telling the insurance agent to deny their claim, causing the Moores to hire an attorney to prosecute their insurance claim. *Id*. at 651–52. The summary judgment evidence included an affidavit from the insurance agent confirming that the Bushmans contacted him and "made a number of negative assertions against the Moores." *Id*. at 652. The *Moore* court reversed the trial court's no-evidence summary

judgment as to this claim, relying mainly on the affidavit of one of the plaintiffs and the insurance agent, and reasoning as follows:

> Based on the above evidence, we conclude the Moores' presented more than a scintilla of probative evidence to raise a genuine issue of material fact on all four elements of their claim. According to Lisa [Moore]'s affidavit, Bushman "had actual knowledge of the contract or business relation in question, or knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the contract or business relationship." *Steinmetz & Assocs., Inc.*[, 700 S.W.2d at 278]. The statements made to [the agent] by Bushman—including that State Farm should not pay the Moores' claim—reflect the occurrence of an act of interference that was willful and intentional. Lisa averred that Bushman's calls were the reason the Moores hired counsel to pursue their claims. Thus the interfering act caused the Moores to incur the expense of hiring a lawyer. Because the Moores met their burden to present more than a scintilla of probative evidence to raise a genuine issue of material fact on each element, the trial court erred in granting a no-evidence motion for summary judgment on their tortious interference claim.

*Id*. at 652.

One of Rubiano's affidavits establishes that he told Ortega about the specifics of the Frost Deal, including the purchase price, and they "discussed the terms of closing, including that Ortega's entity would bring $2.95 million to the table on the date of closing and Frolamo would pay the balance of the [P]roperty." In his other affidavit, Rubiano averred that he suffered a monetary loss as a result of the termination of the Frost Deal. The summary judgment evidence also includes an expert report calculating the damages allegedly suffered by Frolamo based on its claims, including separate calculations for its tortious interference of existing contract claims.

Goudge's deposition testimony establishes that: (1) he knew about the Frost Deal between Rubiano and Frost Bank; (2) he was generally aware of the simultaneous closing arrangement; (3) he knew that Rubiano and Ortega were competitors; (4) he knew that

31

Ortega had expressed an interest in purchasing the entire Property and was involved in a deal with Frolamo to purchase only a portion of the Property[9]; (5) he granted Frolamo extensions based, in part, on the 3BU Deal closing; and (6) Ortega pulling out of the 3BU Deal was one of the reasons he did not grant Rubiano's final six-month extension request, which would have given him the opportunity to secure alternative financing to close on the Frost Deal. The summary judgment evidence also establishes that Ortega reached out directly to Frost Bank to inquire about the closing of the Frost Deal while the Property was still under contract with Frolamo, citing his fear that Rubiano would be unable to close, and Goudge acknowledged that in all his years of experience he had never been similarly contacted by an individual already involved in a contract with a third party for certain property to discuss unilaterally purchasing that property outright. Further, Frost Bank contacted Ortega to discuss purchasing the entire Property only five days after the closing date of the Frost Deal expired. Taken together, this constitutes more than a scintilla of evidence that Ortega, 3BU, and 533 Properties each committed a willful and intentional act of interference with an existing contract which proximately caused injury to Frolamo. *See Vertex Servs.*, 583 S.W.3d at 853.

Further, we disagree with the Ortega appellees' assertion that a plaintiff must prove breach of a particular provision of a contract to sustain a tortious interference with existing

---

[9] For example, during his deposition, Goudge explained that he became generally aware of the 3BU Deal after Rubiano "asked if [Frost Bank] would give his engineers permission to pursue some information they needed . . . to talk to the city about maybe replatting." Goudge continued:

[Rubiano] informed me that where the motor-bank is located, that the bank they had it under contract with did not need that. So they were going to tear down that motor-bank, and he was going to create, replat a pad. . . . He's selling the building, if you will, to this [] Ortega or Freedom Bank or whoever and that he was going to retain this pad.

contract claim. The Texas Supreme Court has stated that "[t]o prevail on a claim for tortious interference with an existing contract," the plaintiff "ha[s] to present evidence that [the defendant] induced [a third party] to 'breach the contract.'" *El Paso Healthcare Sys., Ltd. v. Murphy*, 518 S.W.3d 412, 421–22 (Tex. 2017) (quoting *Holloway v. Skinner*, 898 S.W.2d 793, 794–95 (Tex. 1995)). In *El Paso Healthcare*, a nurse alleged that a hospital interfered with her existing contract with a third party by causing the third party "to remove [her] from the schedule at [the hospital] and stop assigning her to shifts there." *Id.* at 422. The Court found the plaintiff could not recover for interference because "an obligation to provide employment was not a term of [the plaintiff]'s existing contract with [the third party]." *Id*. Likewise, in a Fifth Circuit case cited by the Ortega appellees, the plaintiff's interference claim failed as a matter of law where "[t]he record . . . [was] devoid of any indication that either an individual merchant or an affiliate network breached a contractual obligation as a result of [the alleged interfering party's] conduct." *WickFire, L.L.C. v. Woodruff*, 989 F.3d 343, 356 (5th Cir. 2021). Neither *El Paso Healthcare* nor *WickFire* state that a plaintiff must prove breach of a particular provision of a contract to sustain a tortious interference with existing contract claim.

Rather, this case is more akin to *Guardianship of Workman*, in which the court found prima facie evidence of tortious interference with existing contract under the Texas Citizens Participation Act (TCPA) where real estate agent Mike Reilly

> prepared and sent a letter to Phyllis Copeland and Connie Wooten concerning the pending sale of their sister Sheila's interest in a family property. Reilly's letter stated that the contract to sell Sheila's interest was "likely invalid" and that Sheila's husband "was possibly, fraudulently induced" to sign the agreement on her behalf. After they received the letter, Phyllis and Connie filed a petition seeking a guardianship over Sheila. They also secured a temporary restraining order, which halted the sale. Appellee,

33

Texas Ranch Farm & Minerals, LLC, the buyer, intervened in the guardianship proceeding and asserted causes of action against Reilly for tortious interference with a contract and civil conspiracy.

670 S.W.3d 414, 419 (Tex. App.—Eastland 2023, pet. denied). The court concluded that although the letter sent to the sisters did not specifically encourage them to take any certain action, "it can be rationally inferred that Reilly sent this letter because he hoped the family would do something to prevent the performance of the agreement." *Id.* at 427 (citing *Hansen*, 525 S.W.3d at 689). For similar reasons, the court found that the plaintiff had satisfied the causation element of its tortious interference claim:

> As stated above, the petition that Phyllis and Connie filed specifically cited to and attached Reilly's letter as evidence in support of their request for a guardianship over Sheila. Although the letter was not the only evidence that was referred to and cited in the petition, it can be rationally inferred from the petition, as well as the letter itself, that Reilly's communications with Phyllis and Connie was a substantial factor in motivating Phyllis and Connie to bring suit.

> Likewise, we conclude that Phyllis and Connie's attempt to halt the performance of the contract was a foreseeable consequence at the time that Reilly transmitted the letter to them. In that regard, it is not necessary for Reilly to have anticipated the exact litigation strategy that Phyllis and Connie would advance. Rather, it is enough—for purposes of assessing proof under the TCPA—if it can be *rationally inferred* that Reilly anticipated that *some action* would be taken to halt the sale. "Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable." It does not require that a person must anticipate the precise manner in which an injury will occur.

> We have concluded above that Reilly's intention to interfere, or suggest that the sisters interfere, with the sale can be rationally inferred from the contents of his letter. For the same reasons, it can also be rationally inferred that Reilly could have reasonably foreseen that Phyllis and Connie would do what he intended or suggested—that is, undertake actions to challenge and interfere with the performance of the agreement.

*Id.* at 427–28 (citations omitted).

Although *Guardianship of Workman* involved a slightly different evidentiary

34

standard,[10] we find its reasoning applicable here. Frolamo has produced evidence raising a genuine issue of material fact as to whether Ortega's communications with Frost Bank— while Frost Bank was still under contract to sell the Property to Frolamo—was done in order to prevent performance of the Frost Deal. Frolamo has also produced more than a scintilla of evidence that Ortega's unilateral communication with Frost Bank—expressing interest in purchasing the entire Property while the Property was still under contract with Frolamo, while also stating that he believed Frolamo would be unable to close—was a substantial factor in Goudge's decision not to grant an extension. Finally, Frolamo produced evidence that Ortega could have anticipated that his communication with Frost Bank would have made it less likely that Frost Bank would grant Frolamo any further extensions, and would have otherwise made it less likely that the Frost Deal would close.

Our conclusion is also supported by the Restatement (Second) of Torts, which provides that

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

RESTATEMENT (SECOND) OF TORTS § 766 (1979). According to the commentary, "[t]he phrase 'otherwise causing' refers to the situations . . . when performance by B of his

---

[10] Although the no-evidence summary judgment standard and the prima facie standard under the Texas Citizens Participation Act (TCPA) are distinct, evidence is insufficient under either standard if it is so weak as to constitute no evidence at all, such as conclusory statements or evidence that amounts to no more than mere surmise or suspicion. Compare *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) ("Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." (citation omitted)); with *O'Hern v. Mughrabi*, 579 S.W.3d 594, 604 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("However, conclusory statements are not probative evidence and accordingly will not suffice to establish a prima facie case." (citation omitted)).

contract with C necessarily depends upon the prior performance by A of his contract with B and A fails to perform in order to disable B from performing for C." *Id*. cmt. h; *see also id*. cmt. k ("There is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract. The interference is often by inducement. The inducement may be any conduct conveying to the third person the actor's desire to influence him not to deal with the other."). This is precisely the nature of Frolamo's claim: Frolamo's performance of the Frost Deal necessarily depended upon Ortega's prior performance of his contract with Frolamo, and Ortega failed to perform in order to disable Frolamo from completing the Frost Deal.

Lastly, to the extent that appellees argue that Ortega's actions were done to protect his own legal interests, such a justification defense is an affirmative defense for which Frolamo does not have the burden, and thus no-evidence summary judgment would not be appropriate on that ground. *See* TEX. R. CIV. P. 166a(i); *Haver v. Coats*, 491 S.W.3d 881 (Tex. App. 2016); *see also Fitness Evolution, L.P. v. Headhunter Fitness, L.L.C.*, No. 05-13-00506-CV, 2015 WL 6750047, at *24 (Tex. App.—Dallas Nov. 4, 2015, no pet.) (mem. op. on reh'g) (noting that "[j]ustification is an affirmative defense to tortious interference with an existing contract," and that "[t]he justification defense can be based on the exercise of either (1) one's own legal rights, or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken" (citations omitted)).

### 2. Hausenfluck and Vela

On appeal, Hausenfluck and Vela argue that we should affirm the summary judgments in their favor because (1) the Frost Deal contract had terminated when 533 Properties purchased the Property, and (2) Frolamo failed to provide evidence that

36

Hausenfluck and Vela willfully and intentionally interfered with the contract. As to the first argument, Hausenfluck and Vela misunderstand Frolamo's position. According to Frolamo, the interference did not occur when 533 Properties purchased the Property—it occurred when Ortega reached out to Frost Bank to ask about purchasing the Property before the Frost Deal closing date had elapsed. In asserting its interference with existing contract claim, Frolamo clearly alleged that Hausenfluck and Vela, among other appellees, "create[d] the conditions for the Frost Deal to be terminated so that they could then create a new contract themselves with Frost Bank for the purchase of the Property." Frolamo presented summary judgment evidence that Ortega had reached out to Hausenfluck and Vela as early as February 20, 2020, to discuss an arrangement to purchase the Property.

Likewise, their second argument—that Frolamo's claim fails because there was no evidence that Hausenfluck and Vela personally willfully and intentionally interfered with any of the contracts—also misconstrues Frolamo's position. Frolamo's position has consistently been that Hausenfluck and Vela are proper parties to this suit under various vicarious-liability theories, including joint-venturer liability, which "serves to make each party to the venture an agent of the other venturers and hold each venturer responsible for the wrongful acts of the others in pursuance of the venture." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 225 (Tex. 2017) (noting that the "[t]he elements of a joint venture are (1) an express or implied agreement to engage in a joint venture, (2) a community of interest in the venture, (3) an agreement to share profits and losses from the enterprise, and (4) a mutual right of control or management of the enterprise"); *see also In re Marriage of Louis*, 911 S.W.2d 495, 496 (Tex. App.—

37

Texarkana 1995, no writ) ("Although a joint venture is in the nature of a partnership, its operation is usually limited to a single transaction.").

Frolamo included a separate section in its live petition entitled "Individual Liability on Behalf of a Partnership or Joint Venture (Ortega, Hausenfluck, Vela, 533 [Properties], 3BU, and Freedom Bank)" where it specifically alleged that Ortega acted on behalf of Hausenfluck and Vela, or that Hausenfluck and Vela otherwise ratified Ortega's conduct. Further, Frolamo clarified in its omnibus response that,

> [b]ecause Ortega's actions should be binding upon them, the evidence is that 3BU, [] Hausenfluck, and [] Vela formed a formal general partnership operating under the assumed name [533 Properties]. . . . 3BU controlled the majority of 533 [Properties], while Hausenfluck and Vela acted as silent majority partners. . . . This entity ultimately purchased the subject Property and later leased the space to Freedom Bank. . . . Ortega, Hausenfluck, and Vela agreed to pursue the joint venture to purchase the [P]roperty as early as February 20, 2020.
>
> At all time relevant to this lawsuit, Ortega acted as the President [and] the majority shareholder of 533 [Properties], and an agent and/or principal with apparent and/or actual authority and behalf of 533 [Properties]. . . . In the alternative, 533 [Properties] ratified the actions taken by Ortega in his individual capacity, and/or in the capacities of an agent of his other entities.

Neither Hausenfluck nor Vela addressed this issue in their motions for no-evidence summary judgment. Their motions are substantially similar and merely list the elements of tortious interference, and summarily deny the existence of the elements. The argument in both motions is limited to the following: "[S]pecifically, [Frolamo] has no evidence of an existing contract that Defendant willfully and intentionally interfered with." Nor do Hausenfluck and Vela argue on appeal that they are not liable under the theory of joint-venturer liability, although they do argue that they need not respond to Frolamo's "Agency and Respondeat Superior" claim because it is not "a stand-alone theory of recovery."

38

Neither Hausenfluck nor Vela once refer to joint-venturer liability in their no-evidence summary judgment motions, thus failing to satisfy the specificity requirement of Rule 166a(i). Rule 166a(i) requires that no-evidence motions "be specific in challenging the evidentiary support for an element of a claim or defense." TEX. R. CIV. P. 166a, cmt. The purpose of this requirement is "to provide the opposing party with adequate information for opposing the motion, and to define the issues for the purpose of summary judgement." *Timpte*, 286 S.W.3d at 311 (citation omitted). Hausenfluck and Vela failed to mention joint-venturer liability or otherwise put Frolamo on notice that Hausenfluck and Vela were challenging the allegation that they were liable as joint venturers or that a joint venture existed. *See Id.* (noting that Rule 166a(i) is analogous to the "fair notice" pleading requirements of Rules 45(b) and 47(a)).

Further, Frolamo specifically pleaded that 533 Properties ratified Ortega's conduct, but Hausenfluck and Vela also failed to mention ratification or otherwise put Frolamo on notice that it was challenging that allegation in their no-evidence motions. Under these facts, such a contention would be particularly helpful because ratification can be implied by the circumstances. *See ConocoPhillips Co. v. Hahn*, 704 S.W.3d 515, 526 (Tex. 2024) ("[R]atification may occur when a principal, though he had no knowledge originally of the unauthorized act of his agent, retains the benefits of the transaction after acquiring full knowledge."). Accordingly, under Frolamo's theory of the case, Hausenfluck and Vela could have been unaware of Ortega's actions at the time they were made, but subsequently ratified them. Because Hausenfluck and Vela never challenged the existence of the joint venture or the alleged ratification, Frolamo was never put on notice that they needed to develop and present evidence that Hausenfluck and Vela were liable

39

based on those theories.

Accordingly, Hausenfluck and Vela's argument as to willful and intentional interference is misplaced. Because they never challenged the existence of a joint venture, a fact issue still remains as to whether they willfully and intentionally interfered with a contract *by virtue of their membership in a joint venture*, which allegation was never challenged. *See Merrell Dow Pharms.*, 953 S.W.2d at 711 (noting that when construing evidence in the light most favorable to the non-movant, "every reasonable inference deducible from the evidence is to be indulged in that party's favor"). This is because the existence of a joint venture has several consequences that implicate the elements of the claims and permit the fact finder to make certain inferences and imputations that would not otherwise be appropriate. For example, it is a "well settled rule that the knowledge of one adventurer concerning the adventure is imputed to the other adventurers." *Great Am. Mortg. Invs. v. Louisville Title Ins.*, 597 S.W.2d 425, 432 (Tex. App.—Fort Worth 1980, writ ref'd n.r.e.); *see, e.g.*, *Gaynier v. Ginsberg*, 715 S.W.2d 749, 758 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) ("As joint venturers with Ginsberg, the other defendants are bound by the knowledge of Ginsberg."). Further, "[a] joint venturer may bind his associates by a contract made in furtherance of the joint enterprise." *Otis Elevator Co. v. Zac Smith & Co.*, 715 S.W.2d 806, 808 (Tex. App.—Austin 1986), *aff'd*, 734 S.W.2d 662 (Tex. 1987). Also, "[a]s a general rule, a joint venture is governed by the same rules as a partnership, and vice versa." *Ben Fitzgerald Realty Co. v. Muller*, 846 S.W.2d 110, 120 (Tex. App.—Tyler 1993, writ denied) (citations omitted). For all the above reasons, Frolamo has presented more than a scintilla of evidence to sustain its interference with existing contract claims

40

based on Ortega's conduct as against Hausenfluck and Vela.[11]

### 3. Freedom Bank

Freedom Bank argues that Frolamo waived this issue through inadequate briefing, and that Frolamo does not directly claim that Freedom Bank committed any particular acts distinct from Ortega. However, as previously discussed *supra* part III.A.2, Frolamo's summary judgment evidence defeats Freedom Bank's argument that the only action taken by Ortega attributable to Freedom Bank is the signing of the Freedom Lease. In particular, Rubiano's affidavit shows that Ortega reached out to him on behalf of Freedom Bank when first expressing interest in purchasing a portion of the Property and communicated with him thereafter from his official Freedom Bank email address regarding topics outside the scope of the Freedom Lease, and his unchallenged affidavit provides that Rubiano subjectively believed that Ortega was acting on behalf of Freedom Bank based on his overall conduct. Viewing all the summary judgment evidence in the light most favorable to Frolamo, we conclude Frolamo has raised a genuine issue of material fact as to whether Ortega was acting on Freedom Bank's behalf when allegedly interfering with the Frost Deal. *See Pandozy*, 254 S.W.3d at 599.

## F. Tortious Interference with Prospective Business Relations

"Texas law protects prospective contracts and business relations from tortious interference." *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923

---

[11] For similar reasons, we reject Hausenfluck and Vela's argument that this issue has been waived by inadequate briefing because Frolamo did not adequately cite the record. Rather, this argument only reinforces the conclusion that Frolamo was never put on notice that Hausenfluck and Vela were challenging the existence of a joint venture. *Cf. Timpte Indus., Inc. v. Gish,* 286 S.W.3d 306, 311 (Tex. 2009) (concluding that a summary judgment motion was sufficiently specific based, in part, on the fact that the non-movant "responded thoroughly as to both elements, indicating his understanding of [the movant's] motion").

41

(Tex. 2013) (citations omitted).

> To prevail on a claim for tortious interference with prospective business relations, the plaintiff must establish that (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.

*Id*. (citations omitted). Although "a plaintiff must prove more than mere negotiation occurred,"

> it is not necessary to prove that the contract would have certainly been made but for the interference, that result must have been reasonably probable, considering all the facts and circumstances attendant to the transaction.

*Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475–76 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (citations omitted).

As to the first element, Frolamo has presented more than a scintilla of evidence to survive no-evidence summary judgment. According to Rubiano's affidavit, he has been involved in real estate development for over twenty-seven years, he has "owned and/or developed multiple class A development projects" throughout South Texas, and has "had tenants such as Olive Garden, Longhorn Steakhouse, Raymond James, Black Bear Diner, Verizon, Sleep Number, Sprint, AT&T, Dunkin Donuts, McAlister's Deli, Long John Silvers, the Cash Store, Just-a-Cut, T Mobile and Panda Express." Rubiano's deposition testimony establishes that he had already signed letters of intent from several businesses for leases at the Property, including Olive Garden; he had done an on-site visit to Taco Bell; and had been in touch with the broker for Chili's.

We also conclude that Frolamo's evidence raises a genuine issue of material fact

42

as to whether Ortega, individually and on behalf of other appellees, "either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct." *Coinmach*, 417 S.W.3d at 923. As the Restatement provides with respect to "intent and purpose,"

> The factors to be considered in determining whether an interference is improper [include] the actor's motive and . . . the interest sought to be advanced by him. Together these factors mean that the actor's purpose is of substantial significance. If he had no desire to effectuate the interference by his action but knew that it would be a mere incidental result of conduct he was engaging in for another purpose, the interference may be found to be not improper. Other factors come into play here, however, particularly the nature of the actor's conduct. If the means used is innately wrongful, predatory in character, a purpose to produce the interference may not be necessary. On the other hand, if the sole purpose of the actor is to vent his ill will, the interference may be improper although the means are less blameworthy.

RESTATEMENT (SECOND) OF TORTS § 766B (1979).

Here, Frolamo presented evidence both that Ortega subjectively intended to interfere with the Frost Deal, and that Ortega's conduct was otherwise innately wrong—especially Goudge's testimony as to the atypicality of being contacted by an individual to purchase an entire property where that individual is already involved in a contract with a third party to purchase only a portion of that very property. Accordingly, viewing the evidence in the light most favorable to Frolamo, *see Pandozy*, 254 S.W.3d at 599, we conclude it has presented more than a scintilla of evidence to show that Ortega had the requisite intent to support its interference with prospective business relations claim. *See Coinmach*, 417 S.W.3d at 923.

As to the independent tort element, we have already concluded that Frolamo's fraud claims survive no-evidence summary judgment based on evidence that Ortega

43

intentionally made representations that he never intended to keep in order to induce Frolamo to enter into contracts to its detriment. *See Formosa Plastics Corp.*, 960 S.W.2d at 49. Fraud or fraudulent inducement is an independent tort that may sustain an action for interference with prospective business relations. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 728 (Tex. 2001) (treating fraudulent inducement as an independent tort while analyzing a prospective interference with contractual relations claim).

As to the causation and damage requirements, Rubiano estimated that he would have received around $950,000 in annual rental or lease revenue had the Frost Deal closed, based on selling 35,000 square feet at $20 per square foot, and the fact that the rate in Freedom Bank's lease was $20 per square foot for 10,000 square feet. One of Rubiano's affidavits included a model calculating his damages and detailing how he arrived at his calculations based on comparable cost per square foot market rates. Additionally, Frolamo provided an expert report that also provided a model for its damages.

As one court of appeals has described it, the causation and damage elements can be satisfied if "the defendant's actions prevented the relationship from occurring." *See Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 590 (Tex. App.—Austin 2007, pet. denied) (first citing *Bradford v. Vento*, 48 S.W.3d 749, 757 (Tex. 2001); then citing *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 860 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); and then citing *Ash v. Hack Branch Distrib. Co., Inc.*, 54 S.W.3d 401, 414–15 (Tex. App.—Waco 2001, pet. denied)); *see also Bradford*, 48 S.W.3d at 758 (concluding that "[t]here is no evidence that [the defendant] was intending to prevent [the plaintiff] from dealing with prospective future customers" when

44

providing law enforcement information about a store). Viewing the evidence in the light most favorable to Frolamo, we conclude it presented sufficient evidence to raise a genuine issue of material fact as to these elements. *See Pandozy*, 254 S.W.3d at 599.

The same predicate conduct by Ortega forms the basis of both Frolamo's interference with existing contract and interference with prospective business relations claims. Therefore, with respect to the latter claim, we likewise conclude that Frolamo has raised a fact issue as to whether he was acting on behalf of Hausenfluck, Vela, and Freedom Bank when committing the alleged act of interference, whether they ratified his conduct, or whether they were otherwise liable for his conduct based on the factual and legal theories pleaded by Frolamo and which were not challenged by the appellees.

For all the above reasons, we conclude that Frolamo's interference with the existing contract and prospective contractual relations claims survive no-evidence summary judgment, and we sustain Frolamo's third issue.

## F.    Unjust Enrichment

### 1.    Ortega, 3BU, 533 Properties, Hausenfluck and Vela

By its fourth issue, Frolamo asserts summary judgment was improper on its unjust enrichment claims. Unjust enrichment is an "equitable doctrine" and "is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay." *Walker v. Cotter Props., Inc.*, 181 S.W.3d 895, 900 (Tex. App.—Dallas 2006, no pet.) (citations omitted); *see also Brooks v. Wycough*, No. 12-24-00186-CV, 2025 WL 51842, at *10 (Tex. App.—Tyler Jan. 8, 2025, pet. filed) (mem. op.) (describing "unjust enrichment" as a "claimed entitlement

to . . . equitable relief" "in the alternative to [a plaintiff's] legal causes of action" (citation omitted)). "The unjust enrichment doctrine applies principles of restitution to disputes where there is no actual contract and is based on the equitable principle that one who receives benefits which would be unjust for him to retain ought to make restitution." *Walker*, 181 S.W.3d at 900 (citations omitted).

"Unjust enrichment claims are based in quasi-contract." *Raven Res., LLC v. Legacy Rsrvs. Operating, LP*, 363 S.W.3d 865, 871 (Tex. App.—Eastland 2012, pet. denied). "A contract implied in law, or a quasi-contract, is distinguishable from a true contract because a quasi-contract is a legal fiction, an obligation imposed by law regardless of any actual agreement between the parties." *Freeman v. Harleton Oil & Gas, Inc.*, 528 S.W.3d 708, 739 (Tex. App.—Texarkana 2017, pet. denied). "Generally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory." *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) (citation omitted).[12] "To recover under the theory of unjust enrichment, the claimant must establish that the other party has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Fitzgerald v. Water Rock Outdoors, LLC*, 536 S.W.3d 112, 118 (Tex. App.—Amarillo 2017, pet. denied) (citing *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)).

In their summary judgment motion, Ortega, 3BU, and 533 Properties only challenged this claim by arguing that Frolamo's evidence fails to satisfy the following

---

[12] None of the appellees contended in their motions for summary judgment that an equitable claim for unjust enrichment could not lie because a contract governs the subject matter in dispute. *See, e.g.*, *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 683 (Tex. 2000) (analyzing a case where the defendant "asserted as an affirmative defense that a claim for unjust enrichment is unavailable when an express contract governs the subject matter of the dispute").

disjunctive definition of "unjust enrichment": "Unjust enrichment occurs when a person has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain[; a] person is unjustly enriched when he obtains a benefit from another by fraud, duress, or the taking of an undue advantage." They then go on to argue that there is no evidence that "Ortega and 533 Properties wrongfully secured a benefit or passively received one which it would be unconscionable to retain," "or . . . that [they] obtained a benefit from [Frolamo] by fraud, duress, or the taking of an undue advantage."

In essence, Frolamo claims that Ortega fraudulently induced it to enter into the 3BU Deal contract and the Freedom Lease, with no intention of performing under those contracts, so that Frolamo would act to its own detriment. *See Formosa Plastics Corp.*, 960 S.W.2d at 48. According to Frolamo, Ortega also agreed to simultaneous closings, whereby the 3BU Deal would be used to finance the Frost Deal. Frolamo alleges that Ortega's representations were false when made because he did not intend to perform under the contracts; rather, his intent was to make Frolamo reliant on Ortega for financing in order to sabotage Frolamo's ability to close so that he could purchase the Property from Frost Bank outright at a lower purchase price, and otherwise harm Frolamo by forcing it to expend resources in an attempt to perform under the contracts. Frolamo's expert report supports this theory, finding that Frolamo paid $7,500 to survey the property and $65,000 in earnest money for the Frost Deal. The summary judgment evidence also establishes that Frolamo agreed to purchase the Property for $3.5 million, while Ortega eventually purchased the Property for $3.175 million.

Because we have already concluded that Frolamo's fraud claims survive no-evidence summary judgment, Frolamo has likewise presented more than a scintilla of

47

evidence to establish "unjust enrichment" under the disjunctive definition provided by appellees.[13] *See, e.g.*, *Fitzgerald*, 536 S.W.3d at 118 (analyzing a case where a plaintiff alleged that defendants were "unjustly enriched because their secret formation and operation of a competing business, while still employed [with plaintiff], constituted fraud and took undue advantage of [plaintiff]").

Furthermore—for reasons similar to those underlying our conclusion that Frolamo's interference with existing contract claim as against Hausenfluck and Vela survives no-evidence summary judgment based on the permissible inferences and imputations arising from the unchallenged existence of a joint venture—we conclude that a fact issue still remains as to whether Hausenfluck and Vela were unjustly enriched as joint venturers, or because Ortega otherwise acted on their behalf or his actions were ratified by them.

### 2. Freedom Bank

In its no-evidence motion, Freedom Bank argued that Frolamo "has no evidence to establish that [] Freedom Bank obtained a benefit from it by fraud, duress, or the taking of an undue advantage." On appeal, Freedom Bank argues that Frolamo presented no evidence that Freedom Bank benefitted from Ortega's fraud or interference. We agree. Unjust enrichment is "based on the equitable principle that one who receives benefits which would be unjust for him to retain ought to make restitution." *Walker*, 181 S.W.3d at 900. Throughout its various responses, Frolamo has failed to point to any such evidence.

---

[13] Freedom Bank, Hausenfluck, and Vela provide the same definition of "unjust enrichment" in their motions for summary judgment, but they only challenge the second alternative, namely, that they "obtained a benefit from [Frolamo] by fraud, duress, or the taking of an undue advantage."

For example, in Frolamo's response to Freedom Bank's no-evidence motion, it addressed unjust enrichment as against Hausenfluck, Vela, and Freedom Bank together, concluding that, "[t]o the extent there is more than a scintilla of evidence of fraud by Ortega i[n] all of his apparent or ratified capacities, then the same is true for the claim of unjust enrichment, when the Defendants ended up acquiring the entirety of the [P]roperty that was the subject of the Frolamo / Frost contract." However, even if we assume that Ortega acted on behalf of Freedom Bank when committing fraud or interference, that does not mean that Freedom Bank necessarily benefitted from the switch in ownership. Although Frolamo provided some evidence that the other appellees benefitted from the termination of the Frost Deal by entering into a competing contract at a lower price, it failed to allege or show that Freedom Bank entered into a more favorable or beneficial lease, or that Freedom Bank's bargaining position had changed at all, especially considering that more favorable terms for Freedom Bank would be contrary to Ortega's financial interest.

Where a party is enriched but has no connection to the wrongdoing, there is no unjust enrichment. *Casstevens v. Smith*, 269 S.W.3d 222, 230 (Tex. App.—Texarkana 2008, pet. denied). Conversely, even assuming that Ortega's wrongful conduct could be attributable to Freedom Bank, the unfairness of the conduct alone does not show unjust enrichment, as the doctrine is not a proper remedy "merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant." *City of Corpus Christi v. Heldenfels Bros., Inc.*, 802 S.W.2d 35, 40 (Tex. App.—Corpus Christi–Edinburg 1990), *aff'd*, 832 S.W.2d 39 (Tex. 1992) (citations omitted). Accordingly, because Frolamo failed to allege or show that Freedom Bank received any benefit from Ortega's wrongful conduct, we overrule Frolamo's fourth issue

49

as it pertains to Freedom Bank.

G.      **Constructive Trust**[14]

As with unjust enrichment, "[a] constructive trust is an equitable, court-created remedy designed to prevent unjust enrichment." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015) (citation omitted). "To establish that a constructive trust exists, the proponent must prove (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res." *Hubbard v. Shankle*, 138 S.W.3d 474, 485 (Tex. App.—Fort Worth 2004, pet. denied) (citation omitted). "In weighing the imposition of a constructive trust, a court will identify whether a wrongful taking has occurred." *Bradshaw*, 457 S.W.3d at 87–88 (citations omitted). "A resultant constructive trust may be placed on the property wrongfully taken or the proceeds or revenues generated from the property." *Id*. at 88 (citation omitted). "The theory underlying the constructive-trust remedy is the equitable notion that the 'acquisition or retention of the property is wrongful and that [the possessor of the property] would be unjustly enriched if [the possessor] were permitted to retain the property.'" *Id*. (quoting *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007, pet. denied) (alterations in original)).

Having found that Frolamo's fraud and unjust enrichment claims survive no-evidence summary judgment, only the third element of a constructive trust is at issue. *See Hubbard*, 138 S.W.3d at 485. "To prove an identifiable res, the proponent of the

---

[14] Frolamo's second amended petition specifically included Hausenfluck and Vela in its constructive trust claim. However, only Ortega, 3BU, and 533 Properties challenged the imposition of a constructive trust in their motion for no-evidence summary judgment. Further, Hausenfluck and Vela do not address Frolamo's constructive trust claim in their brief. Accordingly, we do not include them in our analysis of this issue.

constructive trust must show that the specific property that is subject to the constructive trust is the same property—or the proceeds from the sale thereof or revenues therefrom—that was somehow wrongfully taken." *In re Hayward*, 480 S.W.3d 48, 52 (Tex. App.—Fort Worth 2015, no pet.) (citation omitted). On this point, the Ortega appellees' summary judgment motion is limited to the following argument: "[Frolamo] has no evidence . . . that any funds in question in this suit can be traced to the Property." However, Frolamo never claimed entitlement to any *funds* derivable from the Property; rather, it claimed equitable title to the Property itself, arguing that the Property was acquired through fraud and that it would unjustly enrich appellants to retain the Property. A plaintiff may seek to impose a constructive trust on real property. *See id*.; *see also Ginther v. Taub*, 675 S.W.2d 724, 728 (Tex. 1984) (noting that equitable title to real property resulting from a constructive trust is an exception to the statute of frauds); *In re Kerr*, 293 S.W.3d 353, 358 (Tex. App.—Beaumont 2009, no pet.) (noting that for venue purposes, "a demand for a constructive trust on an interest in land is considered tantamount to an attempt to recover the property"). Frolamo was clear that it was "seek[ing] to impose a constructive trust on the Property to ensure [Frolamo's] rightful equitable interest."

Because none of the appellants challenged the imposition of a constructive trust on the Property itself, as opposed to any proceeds or revenues from the Property, the trial court erred by granting summary judgment on that basis. *See State Farm Lloyds*, 315 S.W.3d at 532. Regardless, Frolamo has presented more than a scintilla of evidence to raise a genuine issue of material fact as to whether the Property "is the same property . . . somehow wrongfully taken." *Hayward*, 480 S.W.3d at 52; *see, e.g., In re Marriage of Braddock*, 64 S.W.3d 581, 587 (Tex. App.—Texarkana 2001, no pet.)

51

("Where the grantor voluntarily conveys [real property] to the grantee on a false oral promise that the grantee will reconvey, there is actual fraud justifying the imposition of a constructive trust." (citing *Thigpen v. Locke*, 363 S.W.2d 247, 250 (Tex. 1962)).

Having concluded that Frolamo's unjust enrichment and constructive trust equitable claims survive no-evidence summary judgment as to all appellees, except the unjust enrichment claim against Freedom Bank, we sustain Frolamo's fourth issue in part and overrule it with respect to Frolamo's unjust enrichment claim against Freedom Bank.

## IV.    CONCLUSION

We affirm the trial court's summary judgment as to Frolamo's unjust enrichment claim against Freedom Bank. We reverse the remainder of the judgment and remand for proceedings consistent with this opinion.

L. ARON PEÑA JR.
Justice

Delivered and filed on the
13th day of May, 2025.